MATT SPAN v. JACKSON-WALKER COAL AND MINING COMPANY, Appellant.—16 S. W. (2d) 190.

Division 2, March 2, 1929.

*Morrison, Nugent, Wylder & Berger* and *C. C. Byers* for appellant.

162

*Horace Griffin, C. O. Pingry, W. H. Senner* and *Madden, Freeman & Madden* for respondent.

164

WALKER, J.—This is an action for personal injuries sustained by the plaintiff as a coal miner while in the employment of the defendant in a coal mine in the State of Kansas. The case was tried to a jury in the Circuit Court of Jackson County, Missouri, resulting in a verdict in favor of the plaintiff in the sum of fifty thousand dollars, from which the defendant appeals.

The action was based upon the statutes of the State of Kansas, which require that "every mine shall be supplied with sufficient prop timber of suitable length and size for the places where it is to be used, and kept in easy access to." [Sec. 6276, G. S. Kansas; Sec. 49-205, R. S. Kan. 1923.]

The plaintiff went to work in defendant's mine in February, 1921, and continued in its service to the date of his injury, September 7, 1921. His injury was due to the failure of defendant to supply him with props of suitable length to support the roof of the room where he was working, as required by the Kansas statute above quoted. The plaintiff had called for three-foot props the afternoon before his injury, but instead was supplied with props three feet and four inches in length. He protested against this delivery and demanded that props of the required length be furnished, but his protest was ignored and his demand denied. He tried to use one of these props by digging a hole in the floor, but it was hard rock and he could not dig a hole of sufficient depth. At the depth reached by him he could not stand the prop straight up but only in a slanting position. When

he tapped the prop lightly after placing it in the hole a rock in the roof weighing nineteen hundred or two thousand pounds fell and crushed him. He sustained a fracture of two lumbar vertebrae, had four or five ribs fractured, and received serious internal injuries. He was in the hospital more than nine months and has been unable to walk since his injuries, without crutches. After being injured and before he was operated upon he was entirely paralyzed from the waist down. After the operation he has been partially paralyzed. His left leg has become atrophied and has little or no feeling. His right foot is stiff. There was also testimony as to a curvature of his spine caused by his injuries. The result of his injuries is to wholly incapacitate him from the performance of any labor.

A statement of the facts in detail are not only relevant, but necessary to a complete understanding of the case and to aid in determining the credibility to be given the testimony of certain witnesses.

When the rock fell it entirely covered the plaintiff's body. The rock had to be pried clear of his body before he could be pulled out from under it. His body was doubled up, that, is, bent over on his legs. His carbide lamp was tilted, but still lighted, and the flame was burning his arm. His back was broken and crushed through the lumbar region, and he was paralyzed below the waist line. His chest was crushed, and he was unconscious for over a week following the injury; his memory did not return until some time after Christmas. Owing to his physical condition and consequent low vitality, the operation to remove the broken bones of his spine had to be deferred seven weeks, and the period he was confined to the hospital was more than nine months.

Murphy, a foreman of the defendant, entered the room where the rock had fallen a short time after plaintiff was taken to a hospital. He readjusted the situation in the room before the mine inspector arrived. No props were set up in it when the latter examined the room, but Murphy admitted in his deposition that he found props set up in the room when he arrived right after the occurrence. Murphy made measurements and drawings, locating the fallen rock as up against the face of the coal, so as to show plaintiff was "mining a shot" instead of propping the roof when the injury occurred. According to the mine inspector's testimony under cross-examination, he stated that the rock was seven or eight feet back from the face of the coal. On the same or the succeeding day this inspector states that he took a stenographer to plaintiff's bedside in the hospital, administered an oath to him and took his signature to the untranscribed stenographic notes, which were not read to the plaintiff, for the purpose of showing, as disclosed by the testimony, that the plaintiff was "mining a shot when the rock fell." The defendant's physician who was in attendance upon the plaintiff when he was brought to the hospital testified that he was unconscious at the time and was incapable of under-

standing or giving any statement. The doctor's testimony being that "at that time plaintiff was not fit to talk, and not in a fit condition to give a sworn statement, and on account of his condition his history was not taken by the hospital authorities for over a week after he entered it."

In February, 1921, the plaintiff was employed by Murphy, the defendant's mine foreman, who entered his name on the list of employees. At the time he was hired there was some conversation between him and Murphy as to the plaintiff being out from under the Kansas Compensation Law and the plaintiff expressed a desire to remain so. Murphy assured him that McDivitt, the defendant's underground superintendent, would "fix his paper for him." The plaintiff went to McDivitt's office, as directed by Murphy, and McDivitt asked him his name and that of his former employer and told him to come back in a few days and he would fix the paper for him. When the plaintiff went back to McDivitt's office the latter took two papers from his desk. One of these was a duplicate of plaintiff's election to come out from under the provisions of the compensation law, made in 1917, which McDivitt had obtained from the Western Coal & Mining Co.; the other paper was a declaration to go back under the compensation law, which McDivitt requested the plaintiff to sign. This he refused to do. Plaintiff then asked McDivitt if he was going to fix the paper he had asked for, and McDivitt, referring to the election of the defendant in 1917, stated that it was fixed already and that it was all right. It was under these circumstances that the plaintiff went to work for the defendant, which employment continued until the date of the plaintiff's injury.

The provisions of the Kansas Compensation Law in force before and after the plaintiff's injury, relative to its application to employers and employees, are as follows:

"*Employer's Election.* Every employer entitled to come within the provisions of this act, as defined and provided by this act, shall be presumed to have done so, except such employer privileged to elect to come within the provisions of this act, as provided in Section 1 hereof and Section 5902 of the General Statutes of 1915, unless such employer shall file with the Secretary of State at Topeka, Kansas, a written statement that he elects not to accept thereunder, and thereafter any such employer desiring to change his election shall only do so by filing a written declaration thereof with the Secretary of State. Notice of such election shall be forthwith posted by such employer in conspicuous places in and about his place of business.

"*Employee's Election.* Every employee entitled to come within the provisions of this act shall be presumed to have done so unless such employee shall file with the Secretary of State, before injury, a written declaration that he elects not to accept thereunder, and at

the same time file a duplicate of said election·with his employer, and thereafter any such employee desiring to change his election shall only do so by filing a written declaration thereof with the Secretary of State, and a duplicate of same with his employer. Any contract wherein any employer requires of an employee as a condition of employment that he shall elect not to come within the provisions of this act shall be void.''

The election made by the plaintiff not to come under the provisions of the Kansas Compensation Law with which we are concerned in this controversy is as follows:

''State of Kansas, Crawford County, ss:

''Election of employee not to come within the provisions of Article 6, Chapter 61, General Statutes of 1915, as amended by Chapter 226, Session Laws of 1917.

''To the Secretary of State:

''You are hereby notified that the undersigned Math Span being an employee of Western Coal & Mining Company, of near Franklin, Crawford County, and being engaged as such employee in the occupation or employment of Miner, in the County of Crawford, in the State of Kansas, hereby elects not to accept and not to come under the provisions of Article 6, Chapter 61, General Statutes of 1915, being 'An act to provide compensation for workmen injured in certain hazardous industries,' as amended by Chapter 226, Session Laws of Kansas of 1917.

MATH SPAN,

''Dated this 21st day of July, 1917.

''State of Kansas, Crawford County, ss:

''Before me, the undersigned, a notary public in and for the County of Crawford comes Math Span, who is personally known to me to be the same person who executed the foregoing instrument of writing, and such person duly acknowledged the same to be his voluntary act and deed for the purpose in said writing therein set out.

Witness my hand and my notarial seal, this 21st day of July, 1917.

GEORGE H. STUESSI, Notary Public.

''Filed July 23, 1917, at 9 o'clock, A. M., J. T. Botkin, Secretary of State.''

This is certified to by the Secretary of State as a correct copy of the original on file in his office. In this certificate there is also embodied a former election of the plaintiff made in 1915 to the same general effect as that set out. The making of the second election is shown to have been caused by material changes in the provisions of the law subsequent to the filing of the first election, necessitating a filing of the second one.

I. It is not irrelevant in view of the consideration to be given to the entire testimony to note the attitude of the defendant in regard

168

to this case, as indicated by the conduct of its representatives immediately after the plaintiff was injured; it was that of nonliability to an action of the plaintiff under the Kansas Safety Mining Law. This is attested by the conduct of the foreman, Murphy, in readjusting the condition of the room where the plaintiff was injured soon after he was taken to the hospital; and the taking of the plaintiff's statement and having him sign a stenographer's shorthand notes, which he could not read and it was not read to him, on the same day or the day after the plaintiff was injured, according to the testimony of a mine inspector and a stenographer. In addition, soon after plaintiff's injury, McDivitt, the defendant's underground superintendent, wrote to the Kansas Secretary of State inquiring if the plaintiff had elected to come out from under the compensation law. The Secretary of State answered that Span (plaintiff) was not under the compensation law and that elections to that effect were on file in his office, one of the date of November 30, 1915, and the other of July 23, 1917. The pleadings are further confirmatory of the character of the defendant's defensive attitude, even after this suit was brought, which was on the 12th day of October, 1922, to which the defendant filed a general denial. It was not until the filing of defendant's first amended answer that the compensation law was pleaded. Thereafter, May 9, 1925, the defendant filed a second amended answer, on which the case was tried. In this it was pleaded, as in the first amended answer, that the plaintiff had at no time before his injury filed his election not to accept the provisions of the compensation law and had not filed a duplicate of such election with the defendant. There was also added the common-law defenses of assumption of risk and contributory negligence.

Thus much for the defensive attitude of the defendant, which demonstrates that it is lacking in that essential which the old proverb and many pundits have designated as a jewel.

The reply to the second amended answer is, first, a general denial of the allegations of the answer and, second, a traverse of its affirmative allegations as to the application of the compensation law.

II. It thus appears that the answer does not merely plead the compensation law and rest upon the presumption flowing therefrom that the plaintiff was within its provisions, but alleges that he had not taken the necessary steps to come out from under it. The defendant thus tendered the issue and assumed the affirmative thereof. When the reply was filed traversing the allegations of the answer, the defendant filed no motion to strike it out nor was judgment on the pleadings asked, but upon the issues thus made the trial was had.

So far as concerns this action, therefore, the pleading of the compensation law was equivalent to a declaration that the safety mining law did not apply to the plaintiff because he was under the provisions of the compensation law. The determinative issue, therefore, was whether the mining law did or did not apply and the plaintiff's legal status is to be determined from its application. The meaning of the answer, measured by its allegations, centered on the safety mining law, to which the compensation law was but incidental. The answer alleged that the compensation law abrogated "the law determining the liability, if any, of an employee upon a basis of either common law or statutory negligence." This allegation meant that the safety mining law was not as a cause of action available to the plaintiff, because, as defendant alleged, he was under the compensation law. In other words, he had a certain status which had to be determined as a matter of fact regardless of any presumption under the law pleaded in the answer. Such a presumption would only affect the proof on the issue raised by the answer as to whether the safety mining law applied. Tersely stated, therefore, the contentions of the parties as determined by the pleadings is as follows: on the part of the plaintiff that the filing with the Secretary of State of an election not to accept the provisions of the compensation law and the service of a duplicate of such election upon his then employer, without more, freed the plaintiff thereafter from the provisions of said law; that on the part of the defendant the election of the plaintiff freed him from the provisions of the compensation law only during his service with the employer on whom he has served a duplicate notice of his election; and to render the election operative as to subsequent employers it was necessary to serve each of them with a copy of his election upon entering their service.

III. Under the facts stated and the issue made by the pleadings, we are primarily concerned with the meaning of the Kansas statute (Sec. 44-553, R. S. Kansas 1923; Sec. 24, Chap. 226, Session Laws Kansas, 1917), defining the right of employees to elect not to accept the provisions of the compensation law. The language of this statute is unambiguous and its purpose is clearly defined. In the absence of affirmative action on the part of an employee he is automatically included within its provisions; he may, however, render these inoperative so far as he is concerned, by complying with the terms of the statute, not only as to filing a nonacceptance with the Secretary of State, but in addition, by serving his employer with a duplicate of his election. A compliance with these requirements operates to free him from the provisions of the compensation law and thereafter to render the same inapplicable to him, except by his own act. Such an act is as

clearly defined as that concerning his election not to accept the provisions of the statute and is as follows: "any such employe desiring to change his election shall only do so by filing a declaration thereof with the Secretary of State and a duplicate with his employer."

The plain and direct terms of the statute are such that little difficulty should be encountered in determining their meaning. References to similar statutes of other states, on account of material differences in their language, lend little aid. The compensation statute is remedial in its nature and while it should be liberally construed according to its spirit rather than its letter, such construction should be limited to its salutary features, thereby more fully effecting the purpose of its enactment. This rule, however, has no application where the portion sought to be construed concerns only the manner in which the statute may, as to any particular individual, become operative or its operation may be repudiated. Where the terms defining the right of election in statutes of this character are direct and definite they admit of no gloss and require no commentary. [State ex rel. Brown v. Board of Education, 294 Mo. 1. c. 115, 242 S. W. 85; Trefny v. Eichenseer, 262 Mo. 436, 171 S. W. 932; Grier v. Railroad, 286 Mo. 1. c. 534, 228 S. W. 454.] Especially is this true where the words employed are ample to effect the purpose for which the statute was adopted. [2 Lewis-Suth. Stat. Con. (2 Ed.) p. 698.] That purpose, as we have stated, was to enable employees to repudiate the provisions of the compensation law. To accomplish this the Legislature, in its wisdom, provided first for a formal and permanent notice of the election to be given by requiring the employee to file the same with the Secretary of State and that his then employer might have immediate notice of his act, he was required to file with the former a duplicate of his election. Upon his election having been made, the effect of the same upon his status or his right to a remedy thereafter, in the event of an injury, was limited to himself and his employer. What, therefore, was the purpose of the requirement that the election be filed with the Secretary of State? Evidently it was intended not only to permanently fix the legal status of the employee, but to notify the public, or more immediately future employers, that he was not subject to the provisions of the compensation law. Unless this meaning and purpose be given to the statute the filing required to be made with the Secretary of State, is a mere idle formality. Such a characterization is not justified, either by the terms of the statute or the purpose for which it was enacted. If the filing of the election with the Secretary of State was not intended to establish a permanent status why is the requirement made in express and unmistakable words, that to change the employee's election he "can *only* do so by filing a written declaration thereof with the Secretary of State and a duplicate with his employer." The ex-

clusive character of this course in changing an election is not more so than that required in making it in the first instance. This being true it must follow that if, as contended by the defendant, the rule of construction by implication be applied to the method to be pursued by the employee in regard to an election, then a like method is required to be pursued by the employer.

If, therefore, the meaning of the statute be measured by its language alone, it will not admit of the construction sought to be given to it by the defendant. This conclusion finds ample support in the fact that this statute is exclusive in its application, unambiguous in its terms and sufficiently comprehensive in its provisions to effect the purpose of its enactment. As a corollary to this conclusion another rule of construction may be invoked as determinative of the fallacy of the defendant's contention. There is nothing in the statute indicative of a legislative intent other than that expressed by its words; to give it the construction, therefore, insisted upon by the defendant, it will be necessary to read into it immediately following the words. "with his employer," and preceding the words "and thereafter" the following words, "which *said election shall be valid only during his term of employment with said employer.*" A compliance, therefore. with defendant's contention will necessitate an amendment of the statute. An amendment to a statute cannot be made by judicial construction. To do so would be to invade the province of the Kansas Legislature.

In State ex rel. Cobb v. Thompson, 5 S. W. (2d) 1. c. 59, where a relator was not seeking a construction of an act, but insisted that we amend it by inserting the words "and until their successors are appointed and qualified," we said: "This we are without authority to do. That power is assigned to the legislative branch of the government." So complete are the terms of the statute that no omission therefrom of any character is indicated. Where this is the case and the statute is not incongruous or unintelligible and leads to no absurd result, the court is not justified in making an interpolation therein. [2 Lewis-Suth. Stat. Constr. (2 Ed.) p. 737.]

Another cogent fact which militates strongly against the defendant's contention is that for ten years, from 1917 to 1927, the sections of the statutes concerning the election from the provisions of the statute of employers and employees were not subjected to either legislative amendment or judicial construction. The unchanged condition of the statute for a decade cannot be otherwise reasonably construed than as indicating that its terms were so clear and definite that their meaning and purpose were understood and that they did not require either legislative modification or judicial interpretation. In 1927 the Kansas Legislature determined to change the limit of an employee's election and it enacted the following amendment;

"*Employee's Election*. Every employee entitled to come within the provisions of this act shall be presumed to have done so unless such employee shall file with the commission, before injury, a written declaration that he elects not to accept hereunder and at the same time file a duplicate of said election with the employer, *which said election shall be valid only during his term of employment with said employer*, and thereafter any such employee desiring to change his election shall only do so by filing a written declaration thereof with the commission, and a duplicate of same with his employer. Any contract wherein an employer requires of an employee as a condition of employment that he shall elect not to come within the provisions of this act shall be void." [Laws Kan. 1927, sec. 51, p. 410.]

It will be noted that the amendment consisted in the italicized portion of the act and that it embodies the limit which the defendant insists should be read into the section. If the defendant is correct then there existed neither reason nor necessity for the amendment.

The Legislature of Kansas obviously did not regard the 1917 Act as limiting the validity of an election to the then contract of hire, but properly regarded such a limitation as an amendment and modification of that act requiring legislative action. Under such circumstances defendant cannot in reason declare that the act as amended is identical with the act before amendment. Hence defendant's construction of the 1917 Act is, by the declaration of the Kansas Legislature, unfounded.

It cannot, moreover, be declared that the 1927 amendment merely clarified the legislative intent of the 1917 Act. If the construction of the latter act as not limiting the validity of an election had been contrary to legislative intention, the Legislature would not have waited a period of ten years to clarify their intent. The interval between the 1917 Act and the 1927 amendment demonstrates that the latter was the result of a new and different legislative intention. This amendment was not, moreover, passed as the result of any judicial decision. No case on this question had been determined in the Supreme Court of Kansas. From the fact of the long interval between the enactment of the 1917 Act and its amendment, and the fact that no case involving this question has been presented before the Kansas court, we can draw several conclusions: (1) that the act was universally construed in the same way, since no litigation resulted therefrom during a period of ten years; (2) that the universal construction thus adopted in Kansas was not the construction contended for here by appellant, since, if such construction universally prevailed, the Legislature would not have been required to amend the act, there being under such circumstances neither reason nor necessity for such amendment; (3) as a result, the Kansas construction of this act universally followed did not limit the validity of

elections to the then employer, and plaintiff's election was perfected and maintained according to such universal construction; and (4) such construction was expressive of the legislative intention in the 1917 Act since a universal misconstruction of the act would have resulted in an immediate amendment. The fact that no amendment was made for a period of ten years shows that the prevailing construction of the act was in accord with its provisions as legislatively understood and intended. As a result, the 1927 amendment must be held to represent a new intention and not to have been intended to clarify or correct an ambiguity which we have shown did not exist. In view of all of which we hold that it was not required by the statute that an employee should file a new election upon each employment; or concretely stated that the plaintiff was not under the provisions of the compensation law at the time of his injury.

A not unimportant factor in support of the conclusion as to the meaning of this statute is the unvarying interpretation that has been given to it during the ten years of its operative existence. That the defendant concurred in this interpretation and acted upon it in preparing its defense is demonstrated, as we have stated, by the conduct of its representatives before and after this suit was brought.

Incidentally, it is suggested in one of the briefs that the construction of this statute, as it existed at the time this cause of action accrued, can never again be a subject of controversy. Having never been construed by the Supreme Court of Kansas, and the instant case being the only one in which the matter, here mooted, has ever or can ever arise, since the amendment of 1927, its disposition, while it will not serve as a precedent, will constitute an unalterable and final determination of the meaning of the statute as it existed prior to its amendment.

IV. The questions of estoppel and the authority of defendant's foreman and mine superintendent to bind it by their actions, argued at much length by the parties, become immaterial under our ruling that the plaintiff was not subject to the provisions of the compensation law.

V. Defendant contends that its motion in arrest should have been sustained on the ground that the petition did not state a cause of action. A motion in arrest of judgment reaches only a defect in the record proper, and its propriety must be determined from the face of the pleadings. [McGannon v. Insurance Co., 171 Mo. 143; State ex rel. Conant v. Trimble, 311 Mo. 1. c. 143.] This is an action under a foreign statute. The answer sets up an independent foreign statute in defense; as a result both statutes are facts to be established

174

by competent proof. [Bennett v. Lohman, 292 Mo. 477.] A motion in arrest can only challenge the sufficiency of the petition in so far as such petition could have been challenged by a demurrer; it cannot have the effect of a demurrer to the evidence. [McGannon v. Insurance Company, supra.]

The defendant asserts the insufficiency of the petition on the ground that the allegations of its answer are admitted by the reply, and under the facts appearing in the petition, answer, and reply the petition of plaintiff is insufficient in law. Defendant, in its answer, alleges the fact that at the time of plaintiff's injury a certain statute of the State of Kansas, known as the Compensation Act, was in full force and effect. Plaintiff's reply traverses that averment by a general denial and thereafter pleads as an independent matter in reply that, in effect, if such a statute were established as being in force and effect at the time of plaintiff's injury, he was not barred thereby for certain specific reasons. The general denial in the reply put the existence of the foreign statute, and its force and effect at the time of plaintiff's injury, in issue, and defendant, under such traverse, was required to prove such statute as a fact. The existence of such statute, and its force and effect at the time of plaintiff's injury, do not appear as matters of law from the face of the pleadings, but remain a matter of proof for defendant to establish. The situation is not the same as if the plaintiff had admitted the existence of the force and effect of such statute by its reply, and thereby dispensed with proof thereof. The motion in arrest reaches only the face of the pleadings, and no fact can be considered in determining such motion which requires evidence in proof thereof. [McGannon v. Ins. Co., supra; State ex rel. Conant v. Trimble, supra.] The existence of this foreign statute and its force and effect at the time of plaintiff's injury is a fact (Bennett v. Lohman, supra). Such fact is traversed by the general denial in plaintiff's reply and is thereby put in issue and became a fact not appearing on the face of the pleadings against which this motion is directed, but a fact requiring proof *dehors* the pleadings for its establishment. The decisive question under a motion in arrest is whether proof of the fact relied upon under a motion in arrest is by the plaintiff's pleadings dispensed with; and if there is a traverse, as here, and the defendant is required to introduce proof of such fact in order to avail itself of the defense, such fact cannot be taken advantage of by a motion in arrest. The pleadings disclose that the traverse in plaintiff's reply required defendant to prove that the compensation act pleaded by it was in full force and effect at the time of plaintiff's injury. If defendant had never introduced such law in evidence, as it did, it could not now reply thereon. The case of Mathieson v. Railroad, 219 Mo. 542, relied upon by defendant, was not determined under the limited scope of a motion in arrest. Under such circumstances, the sufficiency

of the plaintiff's petition under this assignment depends on a fact which was put in issue by the reply, was necessarily established by evidence, and was not admitted by the pleadings, and as a result defendant's motion in arrest, under which advantage can be taken alone of facts appearing under the plaintiff's pleadings and the record as admitted, cannot succeed, and this assignment must be overruled.

VI. It is further contended that the petition does not state a cause of action in that it fails to allege that the plaintiff, before his injury, had elected not to accept the provisions of the compensation law.

A plaintiff, in pleading a cause of action, is not required to anticipate that the defendant will raise a certain defense and, as a result, is not required to negative such defense. Especially is this true when the defense is one of fact and not of law. It is absurd to declare that the plaintiff must plead and prove a fact, on which he anticipates the defendant will rely, in order, after thus pleading and proving such fact, to show that it does not affect his cause of action. This would be the effect of requiring the plaintiff to allege that he had elected not to accept the compensation law; and would constitute anticipatory pleading, since plaintiff could not know that defendant relied upon such a defense. In this case the conduct of the defendant indicated that it did not so rely. The petition alleged that this was an action under the Kansas Mining Law. Defendant by its answer traversed this allegation by alleging that plaintiff's right of action was not governed by the mining law, but by the compensation law, and that the former statute did not apply. A pleader is not required to negative a traverse of his allegations. Under defendant's contention, moreover, since the court could not take judicial notice of the Kansas Compensation Law the defendant would be under the burden of alleging and proving, in all details, by competent evidence, the existence and provisions of an independent statute for the sole purpose of showing, after proving such statute, that the same did not apply. The statement of such a proposition is its own refutation. If a plaintiff under such circumstances were required to plead such foreign statute in order to show its nonapplication to his cause, then his failure to prove such statute by competent evidence, although he established his exemption therefrom, would warrant a demurrer to the evidence. The result of such a course would be that a failure to prove a fact which did not affect his cause of action, would constitute failure of proof.

If this rule, as announced by the defendant, has any basis in reason, then not only must the plaintiff plead the compensation law and negative its application, but he must go further and plead and nega-

176

tive the application of the defenses of contributory negligence and assumption of risk, or, stated generally, a plaintiff pleading and relying on a single foreign statute for recovery, in addition to pleading the facts necessary to his recovery, must as well plead and negative the application of all other foreign statutes or other facts on which the defendant may rely as a defense. There is no rule of pleading. which will sustain this contention.

The distinction in pleading between a local and a foreign law cannot be ignored. Even if the application of a local statute must be in the petition be negatived in an action in that jurisdiction in order to state a cause of action, it need not be so negatived in an action in another jurisdiction. The reason for this is clear: In an action in the jurisdiction wherein the statute obtains, the court takes judicial notice thereof and, as a matter of law, supplies such statute to the facts appearing in the plaintiff's petition, and if under the facts there stated, the statute precludes recovery, the court will in certain instances sustain a demurrer; but in an action in a foreign jurisdiction, the statute thus relied upon is a fact which must be pleaded and proved by him who relies thereon, and hence is a matter for answer and not demurrer. As a result, in the foreign jurisdiction, the petition states a cause of action even if, in the jurisdiction of the statute, such a petition would be demurrable. This distinction clearly appears in Bennett v. Lohman, 292 Mo. 477, wherein a demurrer attempting to challenge the sufficiency of a petition by reason of a foreign statute not appearing on the face thereof, is designated as a "speaking demurrer," and was dismissed as worthless. There the defendant attempted to declare that the petition failed to state a cause of action because it appeared that the action was barred under a foreign statute not pleaded or incorporated in such petition. The court denied the validity of such a doctrine, and pointed out that the question whether the petition stated a cause of action was a matter of law, while the question whether a cause of action was barred by the extraneous fact of a foreign statute was an issue of fact not pertaining to the sufficiency of the petition. The court further pointed out that where a foreign statute was relied upon to defeat a cause of action, it did not render the petition insufficient, but that it was required to be pleaded in the answer, and thereupon put in issue by the reply.

The case of Mathieson v. Railroad, 219 Mo. 542, cited by defendant, does not support its contention that in pleading a foreign statute one must plead and negative an independent foreign statute which could not apply if the statute pleaded did apply.

In the Mathieson case the plaintiff pleaded only a portion of the specific foreign statute relied upon for recovery, and omitted that portion which required him to serve certain notices as a condition

precedent to maintaining his cause of action under the part of the statute pleaded. The defendant pleaded the same statute in its entirety, whereupon in reply the plaintiff accepted such statute so pleaded as his basis for recovery, and attempted to plead facts to comply with the notice provisions omitted by him in his petition. The court reversed a recovery under such pleadings, and such ruling was obviously proper. It will be noted, incidentally, that the question of the effect of foreign law on pleadings was not raised in the brief of either party in that cause. The petition in that case, pleading, as it did, certain alleged foreign law, despite a statement in the opinion in passing to the contrary, did on its face state a cause of action. Thus a demurrer thereto could not have been sustained at the time of its filing. But there was a variance between the proof and the petition. The plaintiff there neither relied upon nor proved the statute pleaded in his petition, but instead relied upon and proved a statute essentially different, which required of plaintiff the performance of acts not alleged in the petition. Hence, while the petition stated a cause of action it was not the cause developed in the proof. The petition was not supported by the proof, which established not the cause of action stated in the petition, but the cause of action stated in the reply. Hence the petition was not in itself insufficient as a pleading, but there was a failure of proof of the cause therein stated. The plaintiff there pleaded a statute creating an absolute liability in his petition, but in his reply pleaded and his proof established a statute creating merely a conditional liability. A recovery under such circumstances was properly reversed. It will thus be seen that the Mathieson case does not support the doctrine contended for by the defendant.

A pleader who alleges, as here, that a certain foreign statute applies to the facts pleaded need not also allege that the other statutes do not apply when such statutes could not apply if the statute pleaded did. He need not negative a traverse of his allegations. Plaintiff here pleaded a cause arising under the mining law. Defendant answered that such a cause did not arise for the reason that the mining law did not apply. This was an obvious traverse of the cause stated in the petition. The controlling principle governing the pleading of statutes is well stated in Ansell v. Boston, 254 Mass. l. c. 212, 213, in pointing out, that, if a general liability is created by statute, the exceptions to such general liability created in other sections of such statute or by other statutes need not be negatived by the pleader, but must be asserted in defense by the defendant in its answer; but if a limited liability is created, conditioned in the statute of its creation upon the existence of certain facts or upon the performance by the plaintiff of certain acts, such conditions must be satisfied under the facts alleged and pleaded in the petition. The

Mathieson case is of the latter category; the instant case is of the former, since the mining law creates a general liability, while acceptance of the compensation law creates an exception to such general liability. As a result the exception created by the compensation law is a matter to be asserted by answer and need not be negatived in the petition. To the same effect is Raison v. Board of Education, 137 Atl. (N. J.) 847, wherein it was held under the above doctrine, that exceptions in other sections of the same act need not be negatived by the pleader, but must be raised in the answer by the defendant. [Grand Trunk Ry. v. United States, 229 Fed. 116 (certiorari denied, 241 U. S. 681); Wallace v. United States, 243 Fed. 300.]

While on the subject of pleading it is appropriate to notice the claim made in the answer, but not stressed in the defendant's brief or argument, that no cause of action exists under the mining law, because that statute was abrogated by the enactment of the compensation law. This assignment has by our own court in Maurizi v. Western Coal & Mining Co., 11 S. W. (2d) 270, been ruled adversely to the defendant's contention. In that case it was held that the mining law of Kansas was in full force and effect and had not been abrogated by the enactment of the compensation law.

VII. The defendant complains of the admission in evidence of the election executed by the plaintiff in 1915. The sole objection made to the introduction in evidence of this election was that it was immaterial and had no application to any of the issues in the case. No objection was made on the ground that it was prejudicial. If, as defendant contends, this election was entirely immaterial, then its admission cannot constitute error. The admission in evidence of facts entirely immaterial to the issues and without probative force cannot constitute prejudicial or reversible error. The defendant is limited on appeal to the objection made in the court below and immateriality alone cannot warrant reversal. However, if the defendant had objected to the introduction of this evidence on the ground that it was prejudicial, the admission thereof could not constitute prejudicial error. The burden was upon the defendant to establish that the admission of evidence declared by it to be immaterial and prejudicial constituted actual prejudice. No such prejudice appears. The only prejudice which the defendant alleges is that from the form of this election the jury might mistakenly have inferred that the plaintiff had therein specifically covered the question of election, and that, by the force thereof, the jury might be led to the conclusion that the election of 1915 covered plaintiff's employment by defendant. The fallacy in this claim of prejudice exists in the fact that the effect of the 1915 and 1917 elections and the validity of either or both at the time of

plaintiff's injury, was a question for the court and not for the jury. Hence defendant could not have been prejudiced on an issue which the jury did not and could not under the instructions determine. The extent and validity of an election under a foreign statute are matters for the court and not for the jury; in this case the court determined the efficacy of such election. The 1915 election was never submitted to the jury in the instructions; and with reference to the 1917 election, the only question submitted to them was whether the plaintiff made such an election under his employment by the Western Coal & Mining Company; and the court thereupon declared the effect, extent, and force of such election as a matter of law. This it necessarily had to do. The only facts the jury determined with reference to an election were whether the plaintiff in 1917 filed an election with the Secretary of State and served and filed a duplicate thereof with his then employer. The form of the 1917 election could not mislead the jury nor affect the determination of this question of fact. The form of the 1915 election or the 1917 election could not be considered by the jury in the determination of any issue submitted to them. The jury determined alone the fact that plaintiff executed and perfected an election in 1917; the consequence of such election and the extent of the same were determined by the court. The form, sufficiency, and legal effect of plaintiff's declarations were never submitted to nor determined by the jury. The form of the 1915 election could therefore have no bearing upon any issue determined by the jury and as a result they could not have been misled thereby. As an inevitable result the alleged misleading character of the 1915 election bearing upon an issue determined by the court and not by the jury could not have caused the defendant to suffer any prejudice from its admission. Under these facts the defendant has failed to discharge the burden of showing that its rights were prejudiced by the admission of this evidence and as a result this assignment must be overruled.

VIII. The statements of the defendant's underground mine superintendent, McDivitt, are objected to as constituting offers of compromise and hence inadmissible in evidence. At the trial the only issue of fact on the question of election was whether on plaintiff's employment by defendant, he had, in the manner alleged, caused a duplicate of his election to be filed with the defendant. On this issue the evidence was conflicting, plaintiff affirming, and defendant, through McDivitt, denying that it was made.

After plaintiff's injury he requested defendant to send a representative to see him, and McDivitt went. Subsequently an acquaintance of plaintiff's interviewed McDivitt in plaintiff's behalf. During these two interviews the statements in question were made;

 ██ not deny having made them. In both interviews he declared the plaintiff to be "out from under the compensation law." These statements were admissions of fact, and were in irreconcilable conflict with the position on the facts assumed by the defendant at the trial. A consideration of the situation existing at the time of these statements demonstrates this: (1) If plaintiff's position at the trial on the issue of fact mentioned were true, at the time of his employment he advised McDivitt that he had elected not to accept the compensation law and expressed the desire for McDivitt to comply with any formalities essential to a maintenance of that status; that McDivitt assented and procured a duplicate of plaintiff's election from the Western Coal & Mining Company and declared to plaintiff that he was out from under the compensation law without the necessity of further formalities. (2) If defendant's position at the trial on the issue of fact mentioned were true, no such conversation occurred, no such notice was procured, and McDivitt knew nothing of any election by plaintiff's nonacceptance of the compensation law.

When the plaintiff was convalescing, after his injury, McDivitt declared to him that he was out from under the compensation law and that he could do nothing for him, and also declared to Blazic, plaintiff's friend, that the plaintiff was out from under the compensation law; that plaintiff "went out from under the compensation law," and that he, McDivitt, had papers (flourishing them) to that effect. If the conversations and transactions described by plaintiff as occurring at the time of his employment took place, these statements by McDivitt would be the natural consequence of such occurrences. If no such conversations took place, as McDivitt at the trial declared, then he would not, and could not, have made the statements mentioned. The paper he flourished before Blazic and which he declared had taken plaintiff out from under the compensation law was the duplicate election he procured from the Western Coal & Mining Company; such is the necessary and inevitable inference from his statements so made; if defendant's position was true, he would have had no papers in his possession whereby he could declare plaintiff had gone out from under the compensation law. The miner is, moreover, presumed to accept the compensation law. As a result, unless the conversations and occurrences mentioned took place, McDivitt could not and would not have declared that defendant was out from under the law and, presumptively being under the law, McDivitt would necessarily assume he had accepted it, unless he knew by reason of some such occurrences as plaintiff testified to, as happening at the beginning of his employment, that plaintiff had elected to come out from under the law. In other words, such statements by McDivitt were in necessary and irreconcilable conflict with the facts as asserted by the defendant's witnesses at the trial on the issue of elec-

tion. If, as defendant's witnesses then contended, McDivitt knew nothing about plaintiff's election, and such conversations and transactions at the time of plaintiff's employment did not occur, McDivitt would have no reason to declare that plaintiff was out from under the act, and would have had no information to lead to such a positive declaration. Under the statements of McDivitt, defendant's position at the trial of this issue of fact was conclusively disproved.

The foregoing circumstances under which these statements were introduced in evidence are set forth to demonstrate the fact that the statements of McDivitt were introduced, not as admissions of the ultimate legal conclusion that the compensation law did not bar plaintiff's action, a matter with which the jury could have no concern, and which the court would declare irrespective of the statements of the parties, but solely and exclusively as admissions of fact that the conversations and transactions alleged by plaintiff as occurring on his employment did then actually occur. As such, their admission was clearly one of fact and, as such, competent.

This general rule as to the admission in evidence of statements of this character may be thus briefly stated; when a statement contains or by necessary implication raises inferences of facts in conflict with those a party asserts at the trial to exist, such statements are admissible. In Brookfield v. Drury College, 139 Mo. App. l. c. 366, the rule is thus stated: "The law of evidence as to admissions and statements of a party to the record and in interest, when made contrary to his attitude on the trial, or as to admissions negativing the averments made in his petition, is that such admissions are competent evidence against him whenever or wherever made. [Steinberg v. Ins. Co., 49 Mo. App. 255; Padley v. Catterlin, 64 Mo. App. l. c. 641; Kritzer v. Smith, 21 Mo. 296; Charleston v. Hunt, 27 Mo. 34; State ex rel. v. Bank, 80 Mo. l. c. 633; Schradski v. Albright, 93 Mo. 42; Pomeroy v. Benton, 77 Mo. 64; Bogie v. Nolan, 96 Mo. 85.]"

IX. The defendant contends that the admission of evidence as to the notice given by the plaintiff to the Western Coal & Mining Company and that filed with the defendant was error. The evidence objected to is not set out; the objection made to the same at the trial is not stated; and the ground of objection, now made thereto, is not specified; and no effort is made to show in what manner the defendant was prejudiced by the admission of this testimony. Upon the defendant the burden rests to affirmatively establish such prejudice. Under these circumstances scant consideration may be given to this assignment. [Vette v. Hackman, 292 Mo. 138: Lower v. Mining Co., 142 Mo. App. 351.]

In this connection the defendant complains because "oral testimony" was introduced as to the service of the notice on the Western

Coal & Mining Co., and as to the matters occurring on the filing with the defendant a duplicate thereof. Defendant does not show, however, that it ever objected to the proof of the service of the 1917 election on the Western Coal & Mining Co. As a matter of fact, evidence of the service of such notice on that company was introduced without objection. And so far as "oral testimony" is concerned, by such testimony alone could it be established either that the notice was filed with the Western Coal & Mining Co. or that a duplicate of the same was filed with the defendant. Hence the objections specified in the assignment must fail.

X. It is insisted that error was committed in the refusal of the instruction marked D-3 asked by the defendant. That instruction is as follows:
"The court instructs the jury that there is no evidence in this case that the defendant waived compliance on the part of the plaintiff with the provisions of the Workmen's Compensation Law of the State of Kansas with reference to election not to come under the provisions of said law."

The refusal of this instruction, withdrawing an abandoned issue from the consideration of the jury, or declaring that such abandoned issue was not established by the evidence, was not error. [Northern v. Chesapeake & Gulf Fisheries Co., 8 S. W. (2d) 982, l. c. 996; Dietzman v. Screw Co., 300 Mo. 196, 215, 254 S. W. 59; Schulz v. Smercina (Mo.), 1 S. W. (2d) 113, 119; Lewis v. Packing Co. (Mo.), 3 S. W. (2d) 244, 249; Reith v. Tober, 8 S. W. (2d) 607; Bloomchamp v. Mo. Pac. Ry., 208 Mo. App. 464; Carney v. Brewing Assn., 150 Mo. App. 437; Jepson v. Shaw Transfer Co., 243 S. W. 370, l. c. 373; Kinlen v. Railroad, 216 Mo. 145, 162, 163.]

This instruction was, moreover, abstract and misleading without application to the facts, and could not have been otherwise than confusing to the jury if it had been submitted to them. These objections, however, need not be further considered in view of the rule as to the refusal or withdrawal of the instruction above referred to.

Defendant complains of the refusal of its instruction marked D-4. which is as follows:
"The court instructs the jury that under the evidence in this case defendant is not estopped from asserting that the plaintiff had failed to comply with the laws of Kansas in reference to electing to come from under the provisions of the Workmen's Compensation Law."

Leaving out of consideration the abstract character of this instruction, calculated, if submitted, to mislead the jury, no attempt is made to show that its refusal resulted in prejudicing the rights of the defendant. The burden is upon the defendant to show that the

court's ruling in that behalf deprived the defendant of any right. Absent this showing there could be no injury.

Under our ruling, however, that the plaintiff was freed from the provisions of the compensation law the question of estoppel constitutes an unnecessary burden assumed by the plaintiff. Under such circumstances whether estoppel in this case would be effective or otherwise to preclude the defendant from challenging plaintiff's status is immaterial to the right of recovery herein.

The refusal of the trial court to give instruction marked "D-5" is assigned as error. This instruction is as follows:

"The court instructs the jury that there is no evidence in this case that McDivitt was authorized to waive compliance with the provisions of the statutes of Kansas with reference to the filing of an election by the plaintiff not to come under the provisions of the Workmen's Compensation Law of Kansas."

The refusal of this instruction was proper for the reason we have stated in the refusal of Instructions D-3 and D-4. It purports like D-3 to withdraw the issue of waiver from the jury. The issue of waiver was abandoned, and never submitted to the jury. As a result, this instruction purported to cover an issue no longer in the case at the time it was requested. Plaintiff did not, on submission, assert that McDivitt possessed authority "to waive compliance with the provisions of the statutes of Kansas with reference to the filing of an election by the plaintiff not to come under the provisions of the compensation law." The only occasion when plaintiff could be asserted to have claimed such authority was in the reply; the pleadings are not read to the jury; and as a result there is no reason for withdrawing by an instruction a question of authority neither submitted to the jury nor urged by plaintiff. Refusal of such instruction cannot prejudice appellant; had it been given, it would have been misleading to the jury which was not called upon to consider such an issue. As remarked above, however, the refusal of such an instruction withdrawing or instructing upon an abandoned issue no longer in the case for any purpose, cannot constitute error. [Northern v. Chesapeake & Gulf Fisheries Co., 8 S. W. (2d) 1. c. 996; and authorities cited.]

There was no error, therefore, in the refusal of this instruction.

The refusal of instruction marked "D-6" requested by the defendant is assigned as error. It is as follows:

"The court instructs the jury that under the pleadings and the evidence in this case this action is one for which compensation is recoverable under the Workmen's Compensation Law of the State of Kansas, as provided in Kansas Session Laws, 1917, Chapter 226, Sections 1, 2, 3, 4, 11, 20, 23, 24, 26 and 27, and General Statutes of Kansas 1915, Sections 5902 and 5916, and your verdict must therefore be in favor of the defendant."

184

The instruction is a request for a directed verdict in favor of defendant and amounts to a demurrer to the evidence. The question of the demurrability of this case has heretofore been discussed and determined adversely to defendant's contention. We submit for the reasons we have given in that regard, that no demurrer should have been sustained to plaintiff's cause of action and, as a result, this instruction was properly refused.

Error is also assigned in refusing to give instruction "D-7." It is as follows:

"The court instructs the jury that under the laws of the State of Kansas the plaintiff was required to file an election with the Secretary of State of Kansas that he elected not to accept under the Kansas Workmen's Compensation Law, and to file such declaration after his employment by the defendant and at the same time to file a duplicate of said election with the defendant in order to be out from under the provisions of said act, and there is no evidence in this case that the plaintiff filed such declaration with the Secretary of State after his employment by the defendant, nor that he filed a duplicate thereof with this defendant, and your verdict must therefore be in favor of the defendant."

This is the point raised by defendant under assignment 1. This instruction is a request for an instructed verdict in favor of the defendant, and amounts to a demurrer to the evidence. The matters of law therein asserted have been heretofore considered and ruled against the defendant and we submit for the reasons stated in that behalf, that the plaintiff was not required to file elections with the Secretary of State on successive contracts of hire. Having thus ruled no authority existed for the giving of this instruction.

XI. The defendant complains of the amount of this verdict, which was for $50,000.

One of the most difficult tasks required to be performed by an appellate court is the determination of the justness of a verdict in an action for a tort. It is true that this difficulty does not arise in cases involving the loss of money or property. In such cases the amount of the loss may afford a basis for measuring the damages. In cases of libel and slander, involving anxiety, humiliation and oftentimes mental anguish, no such basis is afforded, and the task becomes more difficult. But in cases of physical injury, involving not only the elements of damages in slander and libel but others, the proper performance of the task is not only difficult, but next to impossible. Hence courts in many jurisdictions, our own included, in the absence of fraud or undue influence, have not only hesitated, but refused to disturb verdicts. To do so, in the absence

of any vitiating influence, would, as the writer has often declared, be substituting the judgment of the appellate court, which can have no knowledge of the case, except that afforded by the cold and unresponsive record, for the intimate and necessarily more comprehensive knowledge of the twelve triers of the fact and that of the judge who, with like knowledge, refused to disturb their verdict. An early English case, Huckle v. Money, 2 Wilson King's Bench, 205, gives affirmative expression to the difficulty referred to. That court, in discussing the question of setting aside a jury's verdict on the ground that the amount of damages assessed was excessive, said: ''The measure of damages, in cases of this character, is vague and uncertain, and it is very dangerous for judges to interfere with a jury's finding.'' In summing up its reasoning that court added: ''It must be a glaring case indeed of outrageous damages in tort, and which all mankind at first blush must think so, to cause a court to grant a new trial for excessive damages.''

Many appellate courts, following with approval the reasoning and conclusion in the Huckle case, have refused to set aside verdicts in tort actions, where the damages were difficult of determination, unless it could be clearly seen that the verdict was the result of error or fraud or that it was based on passion or prejudice. [Bassett v. Moberly, etc., Co., 268 S. W. 645; Bright v. Sammons, 214 S. W. (Mo. App.) 425; Craton v. Huntzinger, 187 S. W. (Mo.) 48; McWhirt v. Railroad, 187 S. W. (Mo.) 830; O. & M. Ry. v. Judy, 120 Ind. 397; Coleman v. Southwick, 9 Johns. 45, 6 Am. Dec. 253; Stuart v. Hoffman, 68 Cal. 381.]

Thus much as demonstrative of the reluctance of the courts to disturb verdicts as excessive in cases of this character.

Preliminary to a fuller statement of the plaintiff's injuries a recital more in detail of the facts in regard to his case are apposite. So unusual are these facts that no dispute exists as to the extent of his injuries and his consequent and permanent disability. The defendant offered no testimony to controvert this fact. The harrowing details of many cases involving grave personal injuries have been examined in vain to discover one in which the destructive effects of the injuries inflicted approached in magnitude those suffered by the plaintiff. The record of the testimony, however, set forth in its fullness, will speak more forcefully than any summary of or comment upon the same. The plaintiff, Matt Span, before his injuries in 1921, was in good health and a powerfully built man of something more than thirty-six years of age. His height was five feet nine inches and his average weight from one hundred sixty-eight to one hundred seventy pounds. At the trial he was four inches shorter in stature and his weight was one hundred thirty-seven pounds.

Dr. C. A. Smith, a surgeon, was called upon soon after the plaintiff's injuries to perform an operation with a view to plaintiff's relief, but could not do so on account of the latter's weakness or general low vitality. This necessitated a delay in the operation until seven weeks later. During this time and for long thereafter this doctor had the plaintiff under his observation and treatment. In performing this operation the doctor testified that he "removed the posterior bony portions of the spinal column, taking therefrom broken pieces of the third and fourth lumbar vertebrae. He found the spinal cord within these vertebrae crushed. Plaintiff was completely paralyzed below the crushed cord and had no control over the functions of either his legs, bowels or bladder, and was wholly impotent so far as his sexual powers were concerned." Four years later this doctor's deposition was taken and based on knowledge then possessed by him, he stated "that the plaintiff had not improved and it was his opinion his disability was permanent; that he would never be able to perform manual labor or move about without the aid of crutches; and that his disability was due to his injuries."

Dr. L. A. Marty, an expert radiologist, took X-ray pictures of plaintiff's spine, which were introduced in evidence. He testified that "these pictures showed a broken, displaced and deformed condition on the spinal column; that a portion of the back bone had been removed which markedly weakened the spine, making it impossible for plaintiff to sustain the upper portion of his body, except with artificial aid and giving him a painful, pinching sensation in the back when he attempted to sit up. The picture also showed an anterior as well as lateral displacement and disclosed that his back bone was broken backward, causing a kinking in the lumbar region. This produced a deformity whereby the weight is borne at an angle instead of a straight line."

Dr. A. L. Skoog, a leading neurologist of Kansas City, testified that he "made a thorough examination of the plaintiff in May, 1925, and again in November, just before the trial." He found that "the plaintiff was unable to walk without support, that he had very little use of the lower extremities so far as their motor function was concerned; in the left leg there was no movement whatever, either at the toe joints, ankle joint, knee joint or hip joint. In the right leg there was a little movement of the knee and hip joint, but not enough to support the weight of his body. He found no movement of the toes in the right foot. There was also a substantial weakness in the muscles adjacent to the lower part of the spinal column and a scoliosis, by which is meant a lateral curvature of the spine. There was a marked, cold, clammy condition of both feet, a little more marked in the left. An atrophic condition existed in his lower extremities, which means when you press the blood out of the skin it is

slow to return to its normal redness." He found a large operative scar over the lumbar and sacral region. The X-ray pictures made by Dr. Marty and offered in evidence, Dr. Skoog testified, "showed a marked deformity of the bones of the first, second, third and fourth lumbar vertebrae, and also an abnormal appearance of the sixth and seventh dorsal vertebrae just below the points of the shoulder blades. Both pictures showed marked deformity in the spinal column and a curved and crushed condition of several vertebrae." Dr. Skoog further testified "that the abdominal reflexes were lost in the plaintiff. This loss covers the region below the navel. All tests showed an entire absence of sexual power, indicating that the plaintiff was suffering from absolute impotency. There was also a marked relaxation of the anus, indicating lack of control over the bowels and a like lack of control of the urine. There is a great deal of wasting of the muscles which are soft and flabby and his joints lack normal mobility." On the doctor's last examination, which was November 20th, just before the trial, he "found no improvement of any of those functions, but there was evidently a little greater degree of a wasting condition, with flabbiness of the lower extremities." This atrophy, or wasting away, was, in the doctor's opinion, the result of the injured spinal cord; "that the plaintiff would never be able to walk without the use of crutches, because the muscles in both legs were severely paralyzed. On the left side there is complete paralysis. If he would try to stand, he would drop like a dead weight to the floor, and in addition he has a weakness of the pelvic muscles; and the injury to and weakness of the muscles of the spinal column impair his ability to use the lower part of his body." The doctor further testified that "the plaintiff could never recover, and no improvement by any means of treatment could be expected in his case. The destruction of a portion of the spinal cord, which is a part of the central nervous system, is a permanent loss, which cannot be restored. The condition indicated that certain nerves were severed in the spinal cord. There is a great impairment of his functions, and his circulation, both in the veins and lymphatics, is impaired. Plaintiff does not really walk, but carries his weight from his shoulders by means of his crutches."

The plaintiff, at the time of his injury, was about thirty-six years of age. He had never before had an ailment or an injury. He was an efficient miner, highly industrious and constantly employed. His earnings were more than $2000 per year, and his life expectancy was more than thirty-one years at the time of his injury.

Racked by pain and a rudderless wreck, his condition causes him not only constant pain and discomfort and humiliation, but renders him offensive to others with whom, under normal conditions, he might seek companionship. No amount of money can compensate him for

what he has lost by his injuries. The most that can be expected is that with an affirmance of this judgment he may be enabled to have the attention during his isolated existence that his condition deserves and requires.

This verdict is not excessive; the judgment should be affirmed, and it is so ordered. All concur.