SALLY J. HUDLOW, RESPONDENT, v. PANSY LANGERHANS AND FRED
LANGERHANS, APPELLANTS.—91 S. W. (2d) 629.

Springfield Court of Appeals.   March 3, 1936.

*A. E. Spencer* and *A. E. Spencer, Jr.,* for appellants.

*W. N. Andrews, C. W. Oldham* and *S. W. Bates* for respondent.

SMITH, J.—The plaintiff is the widow of Samuel H. Hudlow, deceased. Samuel H. Hudlow was struck and killed by an automobile driven by the defendant, Pansy Langerhans, on the 9th day of March, 1934, and plaintiff brought this suit against the said Pansy Langerhans and Fred F. Langerhans, her husband, the owner of the automobile, to recover for the death of her said husband. Plaintiff recovered judgment against both defendants in the sum of $3,000 and from that judgment, defendants have appealed.

The defendants do not question the amount or form of the verdict and raise but three questions in this appeal, to-wit: First, that the court erred in admitting in evidence certain excerpts from the testimony of the defendant, Pansy Langerhans, taken at the coroner's inquest over the body of the said Samuel H. Hudlow, such excerpts containing declarations and admissions of the defendant, offered and admitted as such; Second, that the petition filed by plaintiff, did not properly plead the humanitarian doctrine; Third, that the plaintiff

did not prove the necessary essential facts to establish a cause of action under the humanitarian doctrine, and that the instructions given for plaintiff did not properly submit the humanitarian doctrine.

The case was submitted on the humanitarian doctrine solely.

The first complaint of the defendants has reference to statements made by Mrs. Langerhans at the coroner's inquest. We quote the entire proceeding as shown by the abstract of the record pertaining to this point, as follows:

"My name is Mrs. Herbert Milligan and I live at Baxter Springs, Kansas, and was formerly the stenographer for the coroner of this county, Dr. Hogan. I took the testimony in the inquest over the body of Samuel H. Hudlow at the Webb City Undertaking Company in Webb City, Missouri. I took the testimony of all the witnesses in shorthand, including Mrs. Langerhans and later transcribed it. I kept my shorthand notes for some time and then destroyed them. Plaintiff's Exhibit D is a correct transcript of the testimony of Mrs. Fred Langerhans at the inquest and was written on the typewriter by me from my shorthand notes.

"Mr. Bates (out of the hearing of the jury) : I offer the testimony of Mrs. Langerhans at the coroner's inquest held at the Webb City Undertaking Establishment on the 12th day of March, 1934, inquest held by Dr. Hogan, coroner, and the transcript identified by Mrs. Milligan, the stenographer who took the testimony, on page 10, the following questions and answers:

"Questions by Dr. Hogan:

"Q. Will you tell the jury, Mrs. Langerhans, your version of this wreck out here? A. Well, I was going north on the road and as I came up over a hill like—you see there is a little hill where the road goes in to Oronogo, I saw the old gentleman, I honked and the old gentleman got to one side of the road and turned around and went back in front of me. He wasn't carrying any brush in his hands at the time and I pulled to the side and I hit him with my bumper, with the left side.

"Q. What speed would you judge that you were running at the time? A. Well, I couldn't have been going over thirty or thirty-five, something like that, because I am always afraid of that road that comes out of Oronogo and anyway I saw him there and you never can tell.

"Q. Was Mr. Hudlow going west? A. Well, he went across to the east and then he went back to the west, to the left side.

"Transcript filed by the coroner in the office of L. M. Thomas, then clerk of the County Court of Jasper County, Missouri, in April, 1934.

"Mr. Spencer: We object to the offer of the selected portion of the transcript because the only proper testimony would be the testimony of this witness, refreshing her memory by her notes, as to statements which might have been made by the defendant, Mrs. Langer-

1164

hans; it is nothing official in this transcript, it is not certified by her—by the coroner, and we are deprived of an opportunity to have her take her notes and read from them to test her ability to correctly take and transcribe testimony.

"MR. BATES: The testimony is offered as an admission, identified by the stenographer, and testified to by her as being correct as a transcription of her notes that she took at the inquest.

"MR. SPENCER: My point is if she undertook to answer, was a certain question asked and was a certain answer made, the witness could not use this memorandum for the purpose of refreshing her memory because it is not the original record she made of the transaction.

"MR. BATES:

"Q. Do you remember whether or not any question was asked the witness, Mrs. Langerhans, about the time when she first saw Mr. Hudlow, the deceased, before the car struck him? A. Oh, yes, I remember that they asked her if she saw him before her car struck him.

"Q. What answer, if any, did she make? A. I remember that she said she did see him, I don't remember what words she used exactly.

"Q. Did she say about where her car was or where he was when she first saw him? A. Well, I remember she said she saw him crossing the street—crossing the road, rather, and she was coming up, I believe over a little hill, when she first saw him.

"Q. Which way, if she stated, from the place of the accident was that? A. I don't remember that she said which way she was coming at the time.

"Q. I will ask you this further question, whether or not any question was asked her, if you recollect, about what Mr. Hudlow, the deceased, was doing when she first saw him or before she struck him? A. I think she said he was just walking across the road—wasn't doing anything except walking across the road.

"Q. Was she asked whether or not he looked at her? A. I think she said he didn't look at her.

"Q. He did not? A. No, sir.

"CROSS-EXAMINATION.

"I remember Mrs. Langerhans telling about blowing her horn before she got to him and that she said he was going across the road and turned and came right back in the road again. I don't know if he was going east and came back west or if he was going west and came back east. She said he went across the road and after he got across turned around and started right back in front of her.

"REDIRECT EXAMINATION BY MR. BATES.

"Q. Did she say—was any question asked her about whether or not he was in full view all the time? A. I don't remember if they asked her whether he was in full view.

"Q. Or did she say whether or not he passed out of her view? A. I don't remember that she said.

"MR. BATES: That is all.

"THE COURT: Do you still want to offer it?

"MR. BATES: Yes—

"THE COURT: The objection will be overruled and, the Exhibit D will be admitted.

"MR. SPENCER: We object to the introduction of the exhibit for the additional and further reason, and offer what I have already urged that pending the discussion before the court the counsel for plaintiff saw fit to interrogate her on her own recollection of what the defendant, Mrs. Langerhans, testified to at this inquest and covered it fully and without objection and without reference to the exhibit.

"THE COURT: The court understands now it is offered for the purpose of showing those matters which the witness testified she does not recollect in detail.

"MR. SPENCER: There isn't anything offered that she hasn't testified to. We except to the ruling of the court.

"MR. BATES: I am offering the three questions and the answers thereto on page ten, and that is the one you made objection to.

"MR. SPENCER: The court makes the ruling that it may be admitted in evidence.

"MR. BATES: I will read that to the jury.",

(Thereupon, Mr. Bates reads the three questions and answers heretofore made a part of this record on page 14 hereof.)

"MR. BATES: I want to ask you, Mrs. Milligan, this question, 'Was he walking with his head down?' Is that a correct transcript of the question asked by Mr. Hogan at the inquest at that time, the question was asked Mrs. Langerhans.

"MR. SPENCER: It will be understood this is all going in over our objection and exception.

"A. Well, I can't remember all the questions that were asked.

"Q. Is this a correct transcript? A. Yes, it is.

"Q. Is that question, 'was he walking with his head down' if that question was down there, then she was asked that question? A. Yes, that is correct.

"Q. And the answer, 'Well, I never noticed, and yet, he was, too, because he didn't look up, he seemed to be intent on what he was doing.' Is that a correct transcript of Mrs. Langerhans' answer to that question? A. Yes, it is.

"MR. BATES: That is all.

"Witness recalled.

"MR. BATES:

"Q. If the question, 'Was he walking with his head down' is in this transcript then that is correct and if the answer 'Well, I never

noticed, and yet he was, too, because he didn't look up, he seemed to be intent on what he was doing' is in the transcript then that is the answer Mrs. Langerhans made to the question. A. Yes, sir.

"Q. I want to ask you whether or not this question was asked, if it is a correct transcript of your notes, 'What speed would you judge that you were running at the time?'

"MR. SPENCER: Defendants make same objection, overruled by the court, and defendants excepted thereto.

"A. Well, if it is written down there, yes, that is correct.

"Q. The answer—you may look at the answer, is that a correct transcript of the answer? A. Yes, sir.

"Q. Made by Mrs. Langerhans in answer to the question just asked —just read to you? A. Yes, sir.

"Q. I will read the question, 'What speed would you judge you were going at the time.' A. 'Well, I couldn't have been going over thirty or thirty-five, something like that, because I am always afraid of that road that comes out of Oronogo and anyway I saw him there and you never can tell.'

"To all of which evidence the defendants objected and said objection was by the court overruled, to which action and ruling of the court the defendants at the time excepted and now except."

This record shows that the questions and answers in the transcript were offered and admitted in evidence as admissions of the defendant, Pansy Langerhans. We think these statements were competent testimony against said defendant, for statements against interest are always admissible whether made under oath, orally or in writing. A case where a question very much like this was raised, and where our Supreme Court held that such evidence is competent is the case of Woerheide v. Kelley, 243 S. W. and at page 161 we quote as follows:

"(4) (d) The fourth assignment goes to the admission of certain transcripts of Kelley's testimony, taken in proceedings in the probate court. They were offered as the admission of Kelley. Whilst Kelley was testifying in these proceedings the opposite side had stenographers to take down his statements. These statements are the matters objected to here. The stenographers testified that they correctly took down his statements, and thereafter correctly transcribed the same, and that the transcripts truthfully gave his statements. They were not able to recall from memory the exact language used by him. Upon this evidence the transcripts of his statements or evidence were admitted. This is urged as error, as suggested supra. They were not incompetent. In 22 C. J. 439, it is said:

" 'A person who has taken contemporaneous notes of the former testimony may use them to refresh his recollection. It has been held that if the witness has no present recollection he cannot make the notes evidence by testifying to a recollection that the notes were accurate when made, but the overwhelming weight of authority is to

the contrary, and a *fortiori*, it is no objection that a reporting witness cannot state the former testimony from his recollection alone without reference to his minutes or memoranda. Where it is shown that the original notes have been lost, a copy may be used.'

"This rule is independent of the rule applicable to official stenographers, as is apparent from the text. As to official stenographers this court has ruled in the very recent case of Vessels v. K. C. Light & Power Co. (Mo.), 219 S. W. 88. In this case the stenographers testified to the accuracy of their transcripts. They could not recall each statement of the witness. This was not required. In Jaquith v. Morrill, 204 Mass. 1. c. 189, 90 N. E. 1. c. 559, it is said:

" 'The testimony of the auditor, giving the testimony of a deceased witness as it was heard at the trial before the auditor, was competent. The principal criticism upon it is that the auditor was unable to remember it, except by using his notes. But he said that he knew that his notes were accurate, and that what appeared there was what the witness said before him. [See Holden v. Prudential Ins. Co., 191 Mass. 153, 158; Mayberry v. Holbrook, 182 Mass. 463.] The statement that the notes were accurate fairly included that fact that the notes showed everything that the witness said upon any material matter.'

"So, too, in Ruch v. Rock Island, 97 U. S. 1. c. 695 (24 L. Ed. 1101):

" 'The living witness may use his notes taken contemporaneously with the testimony to be proved, in order to refresh his recollection, and, thus aided, he may testify to what he remembers; or if he can testify positively to the accuracy of his notes, they may be put in evidence.'

"In People v. Murphy, 45 Cal. 1. c. 144 et seq. it was ruled that an attorney's notes were admissible in evidence, where he had testified that his notes were substantially in the language of a deceased witness at a former trial. That official stenographers could identify their transcripts, and swear to the accuracy thereof, and thus have such transcripts admitted, has often been ruled in this State. [Showen v. Met. Street Ry. Co., 164 Mo. App. 41, 148 S. W. 135; Miller v. Geeser, 193 Mo. App. 1. c. 23, 24, 180 S. W. 3, and cases cited in each of the above cases.] The question here is somewhat different. There are no official stenographers of the probate courts. But it appears that even in the case of other stenographers, or parties making contemporaneous writings, where they swear to the accuracy of their notes and the accuracy of the transcript thereof, such transcript may be introduced, where and although the witness cannot recall all of the statements made. It is true that the cases are largely where the evidence of a deceased witness is sought to be introduced, and here it is purely a question of admission made by a living witness. Some of the cases cited in the notes to C. J. cited supra, reach such a case.

We are of opinion that no error was committed in the admission of these transcripts in view of what the witnesses otherwise declared.''

We think many other cases may be cited holding as above. Among them are Welp v. Bogy, 218 Mo. App. 414, 429, and cases there cited, 277 S. W. 603; Grodsky v. Consolidated Bag Co. (Mo. Sup.), 26 S. W. (2d) 618, 621 and cases there cited. We rule this point against the defendants.

The second point raised by the defendants is that the court erred in giving plaintiff's instructions 1 and 2, submitting the case to the jury on the humanitarian doctrine for the reason ''that the essentials of a recovery on said doctrine are not properly pleaded by plaintiff in her petition'' and for the reason that ''said instructions do not properly submit a 'humanitarian doctrine' case due to the fact that the essential elements requisite to establish such a case are not included in the instructions given.''

This of necessity requires an examination of the pleadings as well as the instructions. We deem it unnecessary to quote the entire petition, so omitting the formal parts and the prayer for $10,000 damages, we find the petition reads as follows:

''Plaintiff, for cause of action against the defendants, states that on said . . . day of March, 1934, her husband, Samuel H. Hudlow, now deceased, was engaged in his work at the home of this plaintiff and her said husband, located approximately one hundred fifty yards (150 yds.) north of the intersection of said Oronogo Road with said 'Water Works Road,' aforesaid, and on the east side of said 'Water Works Road;' that her husband, the said Samuel H. Hudlow, was carrying brush and limbs, which he had cut from a tree in his yard on the east side of said road, from the east side of said road and placing them in a pile west of said road, and in so doing it was necessary for him to pass back and forth across said highway; that at the same time, the defendant, Pansy Langerhans, was driving said automobile north over said highway, as aforesaid, and approaching the place where plaintiff's said husband was so employed, as aforesaid, the said defendant, Pansy Langerhans being then and there engaged in the business of procuring household supplies in behalf of her said husband, herself and their family. That it then and there became and was the duty of the defendant, Pansy Langerhans, and the defendant, Fred F. Langerhans, by her the said defendant Pansy Langerhans, in driving and operating said automobile over and upon said public highway, to drive the same in a careful and prudent manner, and to exercise the highest degree of care in the operation thereof, and to sound the horn or signal of warning to any person or persons upon the highway of her approach, so as not to endanger the property of another, or the life or limbs of any person. But, notwithstanding the duty of the defendants in that behalf, the said defendant, Pansy Langerhans, so acting in her own

behalf, and for and in behalf of her said husband, the said defendant, Fred F. Langerhans aforesaid, carelessly, recklessly and negligently ran and drove said automobile at a high and dangerous rate of speed upon and over said highway when she saw, or by the exercise of the highest degree of care on her part could have seen the said Samuel H. Hudlow, husband of this plaintiff, aforesaid, so engaged upon said highway, as aforesaid, and in a position of danger and peril, and the liability of being struck by said automobile, in time, by the exercise of the highest degree of care, to have stopped said automobile, or reduced the speed thereof, or changed the course thereof, and thereby have avoided striking the said Samuel H. Hudlow and injuring and killing him; but, said defendant, Pansy Langerhans, at said time and place, and acting in the capacity aforesaid, carelessly, recklessly and negligently failed to sound the horn on said automobile, or to give any signal of her approach and carelessly, recklessly and negligently drove and ran said automobile at said high and dangerous rate of speed directly upon and against the said Samuel H. Hudlow with great force and violence, striking, maiming, wounding and killing him, the said Samuel H. Hudlow; and that the death of the said Samuel H. Hudlow occurred within six months next before the filing of this petition.''

The two instructions complained of, omitting captions are as follows:

''No. 1.

''The court instructs the jury that if you find from the evidence that on the 9th day of March, 1934, the plaintiff's husband, Samuel H. Hudlow, at the time mentioned in the evidence was engaged in carrying brush and limbs which he had cut from a tree in his yard on the east side of the Water Works Road, and in so doing was passing back and forth across said highway, and that at the same time, the defendant Pansy Langerhans, was driving and operating the automobile described in the evidence, north over said highway that then it became and was the duty of the defendant, Pansy Langerhans, in so operating said automobile upon said public highway to drive the same in a careful and prudent manner, and to exercise the highest degree of care in the operation thereof so as not to endanger the property of another, or the life or limb of any person. And, if you find from the evidence that the said defendant, Pansy Langerhans, for herself and for the defendant, Fred Langerhans, carelessly and negligently ran and drove said automobile at a high and dangerous rate of speed upon and over said highway while the said Samuel H. Hudlow, husband of this plaintiff, was engaged in crossing said highway, as aforesaid, if you so find that he was so engaged, and thereby placed the said Samuel H. Hudlow in a position of peril and danger from being liable to be struck by said automobile (if you so find from the evidence), and if you find that said Pansy

Langerhans, while so driving said automobile for herself and for the defendant, Fred F. Langerhans, if you so find, saw or by the exercise of the highest degree of care on her part could have seen the said Samuel H. Hudlow on said highway in such position of danger and peril, if any, and the liability, if any, of his being struck by said automobile in time, by the exercise of the highest degree of care, to have stopped said automobile, or reduced the speed thereof, or changed the course thereof, with due regard to the safety of the said Pansy Langerhans, and thereby have avoided striking the said Samuel H. Hudlow, and endangering and injuring and killing the said Samuel H. Hudlow, but neglected to do so, if you so find from the evidence, and recklessly and negligently ran and drove said automobile onto and against the said Samuel H. Hudlow with great force and violence, striking, maiming, wounding and killing the said Samuel H. Hudlow, if you so find, and if you find that at the time thereof, the said Samuel H. Hudlow was the husband of the plaintiff, then the defendants are liable in this case, and you will return your verdict in favor of the plaintiff.

## "No. 2.

"The court instructs the jury that even though you may find and believe from the evidence in this case that the plaintiff's husband, Samuel H. Hudlow, was negligent and careless in entering into said public highway, and crossing same under the facts and circumstances in evidence, still if you further find and believe from the evidence that the defendant, Pansy Langerhans, saw, or by the exercise of the highest degree of care could have seen the plaintiff's husband, Samuel H. Hudlow, in a perilous position in and upon said public highway where he would be liable to be struck by said automobile, if you find said Samuel H. Hudlow was in a perilous position therein, within a reasonable time for said Pansy Langerhans, by the exercise of the highest degree of care, to thereafter have stopped said automobile or slackened the speed thereof, or changed the course thereof, with due regard to the safety of said Pansy Langerhans in said automobile, before striking the said Samuel H. Hudlow, and thus have avoided striking and injuring and killing the said Samuel H. Hudlow, but that said Pansy Langerhans negligently failed to do so, and as a direct result thereof, said automobile was caused to strike said Samuel H. Hudlow with such force as to maim and wound said Samuel H. Hudlow, and that thereby, the said Samuel H. Hudlow was injured and killed, and if you find that at the time thereof, the said Samuel H. Hudlow was the husband of this plaintiff, then you cannot find for the defendants on the ground that the said Samuel H. Hudlow himself was negligent in so placing himself in such position of peril, and if you so find the facts, your verdict must be for the plaintiff."

Upon the claim that the essentials of recovery are not properly

pleaded the defendants cite several authorities which they contend show that the petition in this case is not sufficient. Among these cases is the leading case of Banks v. Morris & Co. (Mo. Sup.), 257 S. W. 482. In fact both sides cite and rely on this case. We have read that case carefully, and noted the part of the petition quoted therein, and have compared it with the petition we have quoted herein, and we have reached the conclusion that that opinion does not sustain the contention of defendants here.

That opinion uses this language:

"(2) The constitutive facts of a cause of action under the humanitarian rule, stated in their simplest terms, without any of the refinements, limitations, or exceptions which might arise on a particular state of facts, are contained in this formula;

"'(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.'

"Evidence tending to prove these facts makes a prima facie case for plaintiff."

The defendants contend that the petition in the instant case failed to allege the third requirement designated in the above quotation, in that in no part of the petition is it alleged that the defendant *with the means at hand and safety to herself and car* could have averted the injury after Samuel H. Hudlow was seen or could have been seen by her.

We do not understand the Banks case, supra, to hold that there must be pleaded the specific allegation "That the defendant had at hand the means to avoid injuring the deceased." That opinion at page 485 uses this language "The perilous situation of plaintiff and defendant's knowledge of it are the ultimate issuable facts. Such facts and only such facts must be pleaded. Matters of evidence have no place in a pleading." Our Supreme Court in a recent case, Spoeneman v. Uhri, 60 S. W. (2d) at page 11 in discussing this question, and referring to the Banks case, supra, used this language very much in point here:

"Summing up the matter, the allegation in the petition that the respondent in the exercise of due care could have avoided injury to the appellant by stopping, retarding speed, or turning to one side, implies he had the means at hand and could have done these things without unreasonable hazard to himself or others. We will not go out of the way to say explicit allegations of the existence of these latter facts are never necessary, but we do say they were not vital in this case, where the petition disclosed no emergency threatening

respondent or third parties, where the humanitarian doctrine was plainly invoked, where the evidence in part was directed to that issue, and where neither by motion, objection to testimony, nor otherwise, was the pleading ever challenged until after the evidence was in. But in this connection attention is called to the fact that even in the Banks case, after enumerating the five constitutive elements of a cause of action under the humanitarian doctrine, the opinion goes on a little later to say (302 Mo. 1. c. 267, 268, 257 S. W. 482, 1. c. 485) : 'The perilous situation of plaintiff and defendant's knowledge of it are the ultimate, issuable facts. Such facts and only such facts must be pleaded.' And petitions have been held good which omitted specific averments that defendant had at hand means to avoid injuring the plaintiff without undue hazard to himself or third parties. [Anderson v. Davis, 314 Mo. 515, 522, 559, 284 S. W. 439, 440, 452.]''

It is our conclusion that while the petition might have been more clearly and specifically worded, yet it does sufficiently plead the essentials of recovery under the humanitarian doctrine.

The instructions in this case fairly and reasonably follow the allegations of the petition in submitting the essential elements requisite to establish a cause under the humanitarian doctrine.

We rule against defendants under the second assignment of error.

The third assignment is that there was error on the part of the trial court in refusing to give a directed verdict for defendant at the close of all the evidence in the case for the reason that plaintiff had failed to establish the facts essential to a recovery under the humanitarian doctrine.

In determining the sufficiency of the evidence to override the demurrer we must indulge every inference in favor of the verdict which may reasonably be drawn from the proved facts. [Knight v. Wabash Ry. Co. (Mo. Sup.), 85 S. W. (2d) 392, 397.]

The defendants cite the Knight case, supra, and several others as authority for their contention on this point. We think those cases are not authority for such a holding in this case. Each case has somewhat different facts from all other cases, and in this case the facts must be construed in the light of various court holdings under as nearly similar facts as may be found. No fixed rule can be found which will be applicable to every case. [Mattocks v. Emmerson Drug Co. et al., 33 S. W. (2d) 142, 145.]

Let us see what the situation is in this case. We think the evidence in this case shows that it is not one of those cases where the injured person suddenly and without warning or notice to the driver walked in front of the automobile. The evidence was at least enough to make it a question for the jury as to the obliviousness of approaching danger on the part of the injured party and the knowledge thereof on the

part of the driver of the automobile. The record before us shows that defendant Pansy Langerhans testified as follows:

"When I first saw him I was 656 feet south and he had his head down. He never raised his head as he crossed to the east or when he turned and started back west. I don't know whether he naturally walked with his head down. I blew my horn twice but he didn't appear to notice anything. The road is eighteen feet wide—he was not quite to the center of the road when I struck him. I couldn't go to either side and miss him as he was just east far enough that I hit him with the left fender. If I had tried to pass him on the west I would have struck him with the right fender. I couldn't possibly have stopped at that distance, and went only the length of the car after I struck him. I saw the man and he got across the highway in the ditch to the east and I felt that he would stay there because I had blown my horn twice and it could be heard for a mile, when he turned around and came back west, I did the best I could. I did not say I blew the horn twice when I testified at the inquest because no one asked me that. Mr. Hudlow seemed intent on his duties all the time that I saw him."

And we find in Respondent's Additional Abstract this testimony:

"Q. And 656 feet away you saw him going which direction? A. West.

"Q. With his head down? A. Yes.

"Q. Intent on his duty, and going east was he? A. He turned around and went east. Then he got across the road into the ditch and turned around and started west again.

"Q. At all times being intent on what he was doing? A. I don't know whether he naturally walked with his head down but he never raised it up.

"Q. He never raised his head up and never looked at you? A. (No answer.)

"Q. You had 656 feet until you approached—you had 656 feet seeing a man ahead of you in the highway with his head looking down; you blew your horn? A. Twice—

"Q. (interrupting) And he didn't appear to notice anything but he was very intent on his duty? A. Yes."

And then, too, in one of the answers made at the coroner's inquest, which answer we think was admissible here, as being a statement against interest she said:

"Q. What speed would you judge you were going at the time? A. Well, I couldn't have been going over thirty or thirty-five, something like that, because I am always afraid of that road that comes out of Oronogo and anyway *I saw him there and you never can tell.*"

The defendants contend that the peril arose and only could arise after Mr. Hudlow had walked from the west to the east side and

then suddenly and without warning had stepped back into the travelled portion of the road.

As we understand the testimony Mrs. Langerhans said that when she first saw him he was going west with his head down, then turned around and went east across the road and into the ditch and turned around and started west again, and at all the times he was walking slowly and had his head down.

From the additional abstract we find this part of her testimony:

"Q. That was when you were how far south of him when he crossed the highway? A. About 175 feet back.

"Q. Then you proceeded north? A. Yes.

"Q. He was where? A. On the east side of the road and immediately he turned around and went west.

"Q. Just describe to the jury how he stepped out in the highway going west. A. Well, he didn't any more than get over to the east and stood there a second, I don't know how long, he was just there you might say, and he turned around and went deliberately west again.

"Q. Did he look in either direction? A. I can't say he looke·" either direction.

"Q. What did you do when Mr. Hudlow started back to the west? A. I immediately put on my brakes but I was pretty close to him.

"Q. About how close? A. I would say about twenty-five feet."

There was testimony to the effect that the car going at the rate of thirty or thirty-five miles per hour could have been stopped within a distance of thirty-five to forty feet. She said she was 175 feet from him when he reached the ditch and started back, and that she applied the brakes when she was about twenty-five feet from him. There was evidence that the car when stopped was twelve or fifteen steps beyond the deceased body and it must have been propelled some distance after being struck. So taking this testimony most favorable to the plaintiff the car must have gone more than sixty-five feet after the brakes were applied, if they were applied twenty-five feet back of the man. The inferences to be drawn are that the car was going at considerable speed at the time of the impact for the evidence is that both legs were crushed below the knees and the right leg was nearly severed from the body.

(a) The evidence established facts necessary to recover under the humanitarian doctrine. It is not a case wherein the deceased saw the oncoming automobile as he crossed and recrossed the highway, or a case wherein the injured party suddenly stepped out in front of the automobile without notice to the defendant of his intention so to do, but under all the testimony, a case wherein deceased was oblivious to the approach of the car, had crossed and recrossed the highway in full view of the defendant while she was driving a distance of at least 600 feet and, according to defendant's own testi-

mony, turned immediately and had proceeded almost to the middle of the road on his third trip when the car hit him. It was the duty of defendant, under the facts disclosed by the testimony, in the exercise of the highest degree of care, to bring her car under such control that she could stop, if necessary, and thus avoid striking deceased. This duty arose upon the first appearance of danger and, under the testimony in this case, the first appearance of danger to the deceased was when defendant saw him cross the highway, turn, and, start back, wholly oblivious of the approaching automobile and his obliviousness clearly apparent to the defendant. The following cases are in point on this question. [Gray v. Columbia Terminals Co., 52 S. W. (2d) 809; Banks v. Empire District Electric Co., 4 S. W. (2d) 875; Scoggins v. Miller, 80 S. W. (2d) 724; Spoeneman v. Uhri, 60 S. W. (2d) 9; Iman v. Walter Freund Bread Co., 58 S. W. (2d) 477.]

We think no reversible error was committed in the trial of this case and that the judgment should be affirmed. It is so ordered. *Allen, P. J.*, and *Bailey, J.*, concur.