### NELSON v. TAYON.
No. 43809.

Supreme Court of Missouri.

Division No. 1.

March 8, 1954.

410

Moser, Marsalek, Carpenter, Cleary &
Carter, Lee M. Carter, St. Louis, for appel-
lant.

Henry G. Morris, James C. Porter, St.
Louis, for respondent.

HOLLINGSWORTH, Judge.

Plaintiff sought to recover damages in
the sum of $20,000 for personal injuries
sustained when defendant's automobile, in
which plaintiff was riding as a guest, collid-
ed with an automobile owned and operated
by Ralph Williams at a street intersection
in the City of St. Louis. The jury re-
turned a verdict in favor of defendant and
judgment was entered accordingly. The
trial court sustained plaintiff's motion for
a new trial on grounds it had erred in giving
defendant's Instruction No. 6 and in ad-
mitting into evidence a typewritten tran-
script of a statement made by plaintiff to
defendant's representative as to the manner
in which the collision had occurred. De-
fendant appealed.

The collision occurred at the intersection
of Twelfth and Chestnut Streets at 11:30
p. m. on January 11, 1952. Defendant,
accompanied by plaintiff, was driving south
on Twelfth Street. The Williams car with
which defendant's car collided was proceed-
ing west on Chestnut. The collision oc-
curred in the northwest quadrant of the in-
tersection of those streets. There is a red
flash stop signal at Twelfth governing cars
proceeding west on Chestnut. There is no
stop sign at Chestnut for cars moving north

and south on Twelfth. An ordinance of the City of St. Louis, introduced in evidence by plaintiff, makes it unlawful to operate a motor vehicle in a "congested district" at a rate of speed in excess of fifteen miles per hour. The point where the collision occurred is within one of those districts.

Plaintiff's evidence tended to show: The Williams car came to a stop before entering Twelfth. While stopped, Williams saw approximately four cars coming south along the west half of Twelfth Street about a block north of the intersection. Williams proceeded westward into the intersection, attaining a speed of about ten or fifteen miles an hour as he approached the center of Twelfth. He there applied his brakes, coming to a near stop. The front two cars coming from the north, occupying respectively the first and second traffic lanes west of the center of Twelfth, came to a complete stop at the intersection. Williams continued westward past the stopped cars and had reached a point fifteen to eighteen feet west of the center of Twelfth when defendant's car came around to the right of the stopped cars into the intersection and collided with Williams' car. Williams had seen defendant's car among the several cars approaching Chestnut when they were some considerable distance back. It then appeared to be several feet to the right rear of the cars in the first and second lanes. But he could not see it after the two cars stopped until a moment before the collision and too late to avoid it. One of plaintiff's witnesses testified that defendant's car was going fifteen to twenty miles per hour prior to and at the time of the collision.

Plaintiff testified: As defendant's car crossed Pine Street, one block north of Chestnut, it was in the third traffic lane west of the center of Twelfth. Two or three southbound cars were ahead and to the left of it. These cars slowed as they came to Chestnut. When defendant's car was fifteen to eighteen feet north of Chestnut, plaintiff saw the Williams car proceeding west about ten feet east of the center of Twelfth. Defendant's car was going about twenty to twenty-five miles per hour. Plaintiff exclaimed to defendant, "Oh,

Frank, look out", but he did nothing and the collision occurred. Plaintiff further testified that the collision threw her forward and then backward, wrenched her back, bruised her ribs, and produced pain in her foot and back. She was taken to the City Hospital, where X-rays were made and a cast placed on her foot. The next day the cast was removed, her foot was "reset" and a new cast placed upon it. Her foot was injured and broken across the second and fourth metatarsal bones, and is still painful. It is now deformed and is bandaged most of the time.

On cross-examination, plaintiff was interrogated at length concerning statements made by her in a deposition as to the manner in which the collision occurred, which she undertook to explain. She also denied she ever had any trouble with her foot prior to the collision. After admitting that she had made a statement to one Mr. Meyer, a representative from the insurance company, as to the manner in which the accident occurred, the questions and answers set forth in a transcript of her statement were read to her. As the questions and answers were read to her, she was asked if those questions were asked and if those answers were given by her. Plaintiff's answers were along this line: "I don't recall stating that to these men"; "My head was hurting me"; "No, I don't recall it"; "I can't remember"; "I don't remember much about the conversation * * * I was in shock."

Defendant began the presentation of his evidence by producing Walter Bruning, who testified: He has been a court reporter for five or six years and is now an official reporter for the courts of St. Louis, presently assigned to the criminal division. Defendant's Exhibit 1 is a carbon copy of a statement of plaintiff, taken in shorthand by the witness at plaintiff's home on January 18, 1952. His shorthand notes were destroyed by his wife who has been seriously ill for several years. He transcribed Exhibit 1 from his shorthand notes before they were destroyed. Exhibit 1 represents the statement made by plaintiff in his presence. He took the statement down in shorthand as plaintiff made it and typed it "in the form of

this transcript". He made an original and carbon copy and delivered both to Mr. Meyer. Exhibit 1 is witness's typing. It is one of the copies given to Mr. Meyer.

On cross-examination, witness said all court reporters made some errors, but he did not think there was an error in any material part of the transcript; that he took only the statements made by plaintiff pertinent to the collision as distinguished from casual conversation.

Over plaintiff's objection, defendant was permitted to read said transcript to the jury. Immaterial portions omitted, it is in words following:

"Statement of Elva Nelson, taken at her residence, Number 2120 South Grand Avenue, St. Louis, Missouri, on January 18, 1952.

"Questions by Mr. L. E. Meyer:

* * * * * *

"Q. You were with Mr. Tayon (defendant), I believe? A. Yes.

"Q. What was that date? A. This really happened on the night of the 11th; I imagine it was around 11:30 to 12:00 o'clock.

"Q. That was last Friday night? A. Yes, Friday night, * * *.

"Q. Which way were you folks traveling? A. * * * We had just stopped for the red light at Olive Street and we had come on south and there is a blinker light at Chestnut Street—you can't do any speeding between a stop sign at Olive Street and a blinker light at Chestnut Street, and I seen a red light at Market and Frank (defendant) was going along and this fellow (Williams)—we were both just sitting there and this fellow came up to us so fast—.

"Q. Your car was heading south? A. Yes.

"Q. And the other car was going west? A. He came right on across and hit Frank's car at the left front corner.

"Q. The left front corner? A. Of Frank's car, yes, and the side of his car hit

—this fellow's car hit us—you can see the way Frank's car was hit, and with the impact it swerved Frank's car facing around west. * * * the force of the collision it forced my foot over this way (indicating).

"Q. Your right foot? A. Yes, you see, I have had trouble with this foot and I always keep a bandage around it—if I didn't have that protection on there it might have been worse—Martin Neurological Bandage, it is a kind of bandage around here on my foot, and with that I don't have any trouble during the day—I have that on all the time. We have a nurse that lives at the house, she is at the City Hospital, she said it was probably a wonderful thing I had that bandage around or I would have had a worse break than I did. That was bandaged around where the breaks are (indicating).

* * * * * *

"Q. Yes, how near to the right curb was he (defendant) traveling? A. Oh, we weren't over near the curb, we were going along like we probably would—I imagine we were near the lane, you know.

"Q. You mean it was between the car tracks and the curbing? A. Oh, yes,—uh, huh.

"Q. Were there any cars over to the left of you, a taxicab or anything of that sort headed south? A. I don't think so, no.

"Q. You never saw the car before the accident occurred? A. No, I don't know what rate of speed he was going, either. The only thing, the way he hit us—he would have to be going fast. If we were going fast there wouldn't have been anything left of us.

* * * * * *

"Q. How far did he travel before he came to a stop? A. I don't know, the collision stopped him—you know when he hit us he went on and went up there and stopped.

"Q. Was there anything Mr. Tayon could have done to avoid the accident? A. Well, the only thing is—I mean, if this happened; I don't think either one of us, we

didn't see the fellow; we did not see a thing.

"Q. Was his car lighted? A. I don't know whether that fellow had head lights or not. * . * *

"Q. You could not judge how fast he was going? A. No, I couldn't judge—I didn't see him. I was sitting with my foot over this way and I was kind of resting with my head on Frank's shoulder and it wasn't until he was right there, until he hit us that I knew anything about it.

"Q. You say Mr. Tayon's speed was not fast? A. No. His car is less than two months old, a brand new car.

"Q. He was looking straight ahead? A. Yes. * * *

* * * * * *

"Q. Do you have any doctor in attendance now? A. No, I have not any doctor. Since it was set properly I have not been in any pain.

"Q. When do you think they will take the cast off? A. In about four to six weeks.

* * * * * *

"Q. I believe that's all. You don't think Mr. Tayon was at fault in this accident, do you? A. Oh, no, he was in the clear, there was nothing he could do.

"Mr. Meyer: That's all."

Defendant testified: There were five southbound traffic lanes on the west side of Twelfth Street north of Chestnut. He was driving in the third (center) lane as he approached Chestnut at a speed of about fifteen to twenty miles an hour. There were cars in each of the lanes on his right, both a "little in front" of him and one car in the lane on his left. As he came to Chestnut he saw for the first time a fast travelling car (the Williams car) about fifteen feet to his left and ten feet in front of him. Defendant immediately applied his brakes and had reduced his speed to about five miles per hour when the Williams car struck his car at the left front wheel, turning his car to the west. Defendant's car stopped within a

few feet. The Williams car went about twenty feet west of the west curbline of Twelfth.

One of the grounds upon which the trial court based its order for a new trial was that it erred in giving defendant's Instruction No. 6 for the reasons set forth in assignments Nos. 15 and 17 of plaintiff's motion for a new trial. Those assignments were: (1) It "was misleading and confusing in that it led the jury to believe that defendant's negligence alone must have caused whatever injuries plaintiff sustained, without instructing the jury that if they found him to have been concurrently negligent with anyone else and such negligence caused or contributed to cause her injuries, it could find for plaintiff." (2) It "was further misleading and confusing to the jury by reason of the failure of the court to define 'preponderance of the evidence' ".

Instruction No. 6 reads as follows:

"The Court instructs the jury that the plaintiff seeks to recover damages from the defendant on the ground that the defendant was negligent and that his negligence caused whatever injuries plaintiff sustained.

"The Court instructs you that negligence is never presumed and the burden is on the plaintiff to prove her case by a preponderance of the evidence, and unless the jury believes that the defendant was negligent, and that such negligence has been proven by a preponderance of the evidence, then plaintiff is not entitled to recover and your verdict will be in favor of the defendant."

At plaintiff's request, the jury was instructed as follows:

"The Court instructs you that if you find and believe from the evidence and under the other instructions given you that the defendant in this case was negligent, and that such negligence, if any, directly concurred with the negligence of any other persons or automobile drivers and contributed to cause the

plaintiff's injuries, if any, then you are instructed that your verdict should be in favor of the plaintiff and against the defendant."

It seems obvious that in sustaining assignment No. 15 of plaintiff's motion for new trial the court overlooked the fact that it had fully instructed the jury on defendant's liability if the jury found defendant's negligence, as submitted in the instructions, caused or contributed to cause plaintiff's injuries.

Moreover, the trial court gave four verdicts directing instructions in behalf of plaintiff: one hypothesizing defendant's negligence in failing to yield the right of way; one hypothesizing his negligent failure to keep a lookout ahead and laterally; one hypothesizing his negligence under the ordinance limiting the speed of motor vehicles in "congested districts" to fifteen miles an hour; and one hypothesizing defendant's humanitarian negligence. In each of these instructions, with one exception, a verdict for plaintiff was directed if the jury found that the negligence therein hypothesized "caused or contributed to cause" the collision and plaintiff's injuries. Plaintiff's instruction predicated upon the ordinance omitted, presumably through inadvertence, the phrase, "or contributed to cause".

Instruction No. 6 is not in fact erroneous as far as it goes. Plaintiff admits that "considered merely as an abstract statement of a proposition of law, [it] may be impregnable to proper criticism", but contends that, nevertheless, as applied to the issues in this case, it is misleading, confusing and highly prejudicial to plaintiff. We do not think so.

 Standing alone, the omission complained of could, and probably would, have been misleading. But the other instructions cured any possibility of confusion by explicitly directing the jury that if defendant was negligent in one or more of the instances hypothesized in the instructions and that his negligence caused or contributed to cause plaintiff's injuries, then defendant was liable. When, as here, the instructions,

read and construed as a whole, contain a complete exposition of the law necessary to guide the jury in arriving at a verdict and are not contradictory, the verdict will be sustained even though one or more of them, separately considered, would have been misleading had it or they not been supplemented or explained by the others. West v. St. Louis Public Service Co., Mo.Sup., 236 S.W.2d 308, 313; Rhinelander v. St. Louis-San Francisco Ry. Co., Mo.Sup., 257 S.W.2d 655, 659. And where, as here, the instruction complained of is not erroneous and, as supplemented by the other instructions, manifestly could not have been misleading or confusing, the trial court was not vested with discretion to declare it so. Warren v. Kansas City, Mo.Sup., 258 S.W. 2d 681, 683.

Apparently, the trial court relied upon the case of Seago v. New York Central R. Co., 349 Mo. 1249, 164 S.W.2d 336, 341, 147 A.L.R. 372, in sustaining plaintiff's motion for new trial for failure to define the phrase, "preponderance of the evidence", in Instruction No. 6. In the Seago case, this court had under consideration a burden of proof instruction containing the phrase, "to your satisfaction." In the course of the opinion, it was noted that in Nelson v. Evans, 338 Mo. 991, 93 S.W.2d 691, 695, this court quoted with approval from Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S.W. 2d 58, 63, as follows:

" 'Instructions on burden of proof should not state too many technical rules and, if an attempt is made to go into degrees of preponderance of evidence, it is almost certain to get the matter so complicated that a jury of laymen will have no idea at all as to what is meant. "A short, simple instruction, telling the jury that the burden is on plaintiff to prove his case by a preponderance or greater weight of the credible evidence, and that unless he has done so the jury must find for defendant, ought to be sufficient to inform the jury what plaintiff is required to do. A plain declaration to that effect will be easily understood by a jury. The more the instruction is elaborated upon, the more complex it becomes and the more it

is likely to be misunderstood." [Citing case.] Certainly all that ought to be required, in addition to such a statement as to which party has this burden, should be a clear definition of preponderance of evidence, informing the jury that what is meant thereby is evidence which is more convincing to them as worthy of belief than that which is offered in opposition thereto.' "

■ Plaintiff places great emphasis upon the last sentence of the above quotation, failing to note that in more recent cases we have omitted that requirement from our definition of a proper burden of proof instruction. Phillips v. Vrooman, 361 Mo. 1098, 238 S.W.2d 355, 360; Wilt v. Moody, Mo.Sup., 254 S.W.2d 15, 22. But, be that as it may, if plaintiff desired that the jury be instructed as to the meaning of the phrase, "preponderance of the evidence", she should have requested an instruction to that effect. In the absence of such a request, the court did not err in failing to define it. See collected cases, 27 Mo.Dig., Trial, ▮▮▮▮▮▮▮▮

Did the court err in admitting the transcript of plaintiff's statement? Plaintiff contends the best evidence of the statement would be the oral testimony of the person to whom it was made; that no foundation was laid for the introduction of secondary evidence; that to permit counsel for defendant to read therefrom was error for the same reason; and that the transcript was not shown to be correct and was not signed by plaintiff. She relies upon Littig v. Urbauer-Atwood Heating Co., 292 Mo. 226, 237 S.W. 779, 785. In that case, *defendant's witness,* Leritz, was on the witness stand undertaking to testify as to statements made by some of plaintiff's witnesses. *Defendant's counsel,* under the guise of refreshing Leritz's memory as to their statements, was permitted to read to him from a memorandum claimed to have been written down by Leritz while they made the statements. The court held, 237 S.W. loc. cit. 785, that if Leritz had forgotten the statements he should have been

permitted to refresh his memory by referring to the memorandum solely for that purpose, but "in no event should he have been permitted to read the memorandum itself to the jury over plaintiff's objection. On the contrary, after reading the memorandum, in good faith, solely to refresh his recollection, he would be compelled to resort alone to his memory in detailing what occurred, instead of reading from the memorandum." The rule therein announced is not applicable to the facts in the instant case. In the instant case, defendant's counsel did not read any portions of the statement to defendant's witness Bruning. He read them only to plaintiff for the purpose of laying a foundation for admission of the statement. Having properly laid that necessary element of the foundation for admission in evidence, he then placed the witness Bruning upon the stand to establish the authenticity of the transcript.

■ Any statement, oral or written, made by plaintiff conflicting with material testimony given by her at the trial is, of course, admissible. Span v. Jackson-Walker Coal & Mining Co., 322 Mo. 158, 16 S.W.2d 190, 201. The case of Woerheide v. Kelley, Mo.Sup., 243 S.W. 158, is in point on the admissibility of the transcript in question. In that case the court said, 243 S.W. loc.cit. 161:

"The fourth assignment goes to the admission of certain transcripts of (defendant) Kelley's testimony, taken in proceedings in the probate court. They were offered as the admission of Kelley. Whilst Kelley was testifying in these proceedings the opposite side had stenographers to take down his statements. These statements are the matters objected to here. The stenographers testified that they correctly took down his statements, and thereafter correctly transcribed the same, and that the transcripts truthfully gave his statements. They were not able to recall from memory the exact language used by him. Upon this evidence the transcripts of his statements or evidence were admitted. This is urged as

error, as suggested supra. They were not incompetent. In 22 C.J. 439, it is said:

" 'A person who has taken contemporaneous notes of the former testimony may use them to refresh his recollection. It has been held that if the witness has no present recollection he cannot make the notes evidence by testifying to a recollection that the notes were accurate when made, but the overwhelming weight of authority is to the contrary, and a fortiori, it is no objection that a reporting witness cannot state the former testimony from his recollection alone without reference to his minutes or memoranda. Where it is shown that the original notes have been lost, a copy may be used.'

"This rule is independent of the rule applicable to official stenographers, as is apparent from the text. * * * In this case the stenographers testified to the accuracy of their transcripts. They could not recall each statement of the witness. This was not required.

\* \* \* \* \* \*

"That official stenographers could identify their transcripts, and swear to the accuracy thereof, and thus have such transcripts admitted, has often been ruled in this state. [Cases cited.] The question here is somewhat different. There are no official stenographers of the probate courts. But it appears that even in the case of other stenographers, or parties making contemporaneous writings, where they swear to the accuracy of their notes and the accuracy of the transcript thereof, such transcript may be introduced, where and although the witness cannot recall all of the statements made. * * * We are of opinion that no error was committed in the admission of these transcripts, in view of what the witnesses otherwise declared." See also Hud-

low v. Langerhans, 230 Mo.App. 1160, 91 S.W.2d 629, 633.

The law as declared in the Woerheide case so clearly and soundly refutes every contention here made against the admissibility of the transcript we need not pursue the matter further. It was properly admitted and the trial court erred in holding to the contrary. But the trial court further ruled it had erred in admitting the statement because it contained conclusions of law and misled the jury. The conclusion referred to was plaintiff's answer to the question, "You don't think Mr. Tayon was at fault in this accident, do you?", to which plaintiff replied, "Oh, no, he was in the clear, there was nothing he could do."

The court had not erred in admitting the above question and answer. The answer was made by a party to the suit. It was based upon plaintiff's personal knowledge of the facts. It was contrary to and at war with the testimony given by her at the trial and was clearly admissible. Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S. W.2d 618, 620; Huelsmann v. Johnston, Mo.App., 213 S.W.2d 641, 643.

█ Plaintiff finally contends that the verdict should have been set aside as against the weight of the evidence even though the trial court refused to do so. Upon appeals from judgments based upon a jury verdict, the appellate court is without authority to weigh the evidence. Nichols v. Bresnahan, 357 Mo. 1126, 212 S.W.2d 570, 572; Romandel v. Kansas City Public Service Co., Mo. Sup., 254 S.W.2d 585, 589; 3 Mo.Dig., Appeal and Error, █

The cause is remanded with directions to set aside the order granting plaintiff's motion for a new trial and to enter judgment in conformity with the jury's verdict.

All concur.