Marie BOULCH and Thomas Boulch,
(Plaintiffs) Respondents,

v.

JOHN B. GUTMANN CONSTRUCTION COMPANY, Inc., and Richard E. Harder, d/b/a Richard E. Harder Contracting Company, (Defendants) Appellants.

Nos. 31097, 31098.

St. Louis Court of Appeals.

Missouri.

March 19, 1963.

Hartman, Guilfoil & Albrecht, James L. Homire, Jr., E. C. Albrecht, Jr., St. Louis, William J. Becker, Clayton, for defendants-appellants.

Grantham, Eaker, Henry & Dempsey, Robert W. Henry, Richard B. Dempsey, Clayton, for plaintiffs-respondents.

RUDDY, Acting Presiding Judge.

Marie Boulch and Thomas H. Boulch, her husband, brought this action against St. Elizabeth's Academy, a corporation; John B. Gutmann Construction Company, Inc., a corporation; and Richard E. Harder doing business as Richard E. Harder Contracting Company.

In the first count of the petition Marie Boulch alleged that she fell on a sidewalk and that she was caused to slip and fall by reason of the muddy condition of the sidewalk, which condition said plaintiff alleged was due to the carelessness and negligence of defendants and each of them. In this count Marie Boulch claimed damages for personal injuries sustained by her when she fell. Count II of the petition was for damages sustained by Thomas H. Boulch on account of the injuries sustained by his wife.

A trial by jury resulted in a verdict and judgment in favor of Marie Boulch on Count I of the petition in the sum of $10,000 and in favor of Thomas H. Boulch on Count II of the petition in the sum of $5000. Both verdicts were against the defendants, John B. Gutmann Construction Company, Inc., and Richard E. Harder, doing business as Richard E. Harder Contracting Company. A motion to dismiss the action against the St. Elizabeth's Academy,

a corporation, filed at the close of all the evidence in the case was sustained by the trial court.

Defendants John B. Gutmann Construction Company and Richard E. Harder, doing business as Richard E. Harder Contracting Company have appealed from the judgment.

One of the points relied on by both of the defendants is that the plaintiffs have failed to make a submissible case against them and each of them and that the trial court erred in overruling their respective motions for a directed verdict.

We shall refer to defendant, John B. Gutmann Construction Company, a corporation, as the Gutmann Company and Richard E. Harder, doing business as Richard E. Harder Contracting Company, as Harder.

St. Elizabeth's Academy owns and operates an educational institution in the City of St. Louis. The properties owned by the Academy are bounded on the south by Arsenal Street, on the north by Pestalozzi Street, on the east by Louisiana Avenue and on the west by Tennessee Avenue. St. Elizabeth's Academy was engaged in the construction of a gymnasium and the remodeling of some of its buildings. Preceding the new construction, some old buildings were razed and excavations were made for the new buildings. There were two driveways leading into and out of the premises on to Louisiana Avenue, one of them within 100 feet of Pestalozzi Street and the other within 70 or 80 feet of Arsenal Street. There was considerable difference of opinion as to the use of the driveway close to Pestalozzi Street by the trucks of defendant Harder. However, considering the testimony which is favorable to the plaintiff, there was evidence to show that the trucks of Harder used this driveway in hauling mud out of the excavation.

Some time prior to February 1st, 1957, the Gutmann Company, as general contractor, was engaged by the St. Elizabeth's Academy under a written contract to do the construction and remodeling of the buildings. Harder was engaged in the business of digging excavations and pile drilling and was a successful bidder to do this work as subcontractor under the general contract procured by the Gutmann Company.

The evidence shows that the excavation did not go any lower than the level of the adjacent streets and that it was necessary because the ground on which the Academy was situated was generally higher than the level of the surrounding streets.

While the excavation work was being performed defendant Harder was personally present every day that work was done under the subcontract. He had a labor foreman on the job who would supervise the work of his employees. The foreman of the Gutmann Company gave to Harder and his employees the lines and the grades to be followed in the excavation work. In this connection the foreman of the Gutmann Company told Harder and his employees how deep to excavate and where to excavate, but the details of how it was to be done were left to Harder's control and direction. Harder was told by the foreman of the Gutmann Company to store some of the dirt and mud, that was being excavated, on the premises to be used for "back fills" and Harder and his employees were told by Gutmann's foreman where to store the dirt and mud on the premises. Harder said that beyond telling him and his employees where to dig and how deep to dig and where to store the mud on the premises, no other control was exercised by the Gutmann Company in the work of the excavation under the subcontract.

The Gutmann Company through its employees did not tell Harder what route to follow when the trucks took the dirt and mud off the premises, nor did they exercise any other type of control over the trucks when leaving the premises. Harder admitted that the Gutmann Company's foreman was present at all times to check whether the work done by Harder com-

plied with the specifications on the job. The evidence shows that at no time did the Gutmann Company or its employees tell Harder how many trucks to use or how fast he should do the work. At no time did the Gutmann Company or its employees tell Harder's truck drivers where to go or what to do. The men who operated the trucks that carried the dirt and mud from the described premises were employees of Harder and were paid by him. In the course of the excavation work under the subcontract Harder used the blue prints and written specifications that were provided for the construction of the buildings. At no time during the entire excavation work did any trucks take dirt and mud off the premises of the St. Elizabeth's Academy other than those belonging to or under the control of Harder.

John B. Gutmann, President of the Gutmann Company, testified that, as general contractor, his firm, through its employees, watched over the job and the work of the subcontractors and in connection with the subcontractor doing the excavation his employees saw to it that the excavator started at the proper location and followed all the marks laid out for excavation and saw to it that he would dig to the proper depth and that his company as general contractor watched to see that the subcontractor in the course of the excavation did not go beyond the prescribed bounds for the building.

For several weeks prior to February 1, 1957, the date on which plaintiff, Marie Boulch, fell, it had snowed intermittently and during that period the weather was cold. The testimony of witnesses showed that ice and snow had formed on the streets and on the sidewalk in the area of the Academy. The trucks owned or controlled by Harder were carrying the dirt and mud from the excavated places on the premises of the Academy out through the driveways and over Louisiana Avenue. The mud was described by various witnesses as "clay colored," "brown clay," and was seen falling from some of the trucks as they traveled over Louisiana Avenue and this mud was also seen at the intersection of Louisiana Avenue and Pestalozzi Street, especially at the south crosswalk of that intersection. Harder admitted that mud would drop from the trucks as they moved along the street. The trucks used were equipped with dual wheels on the rear and the evidence showed that mud would lodge between the dual wheels and as the trucks traveled, the mud would loosen and would be thrown onto the street. Some of the mud landed on the sidewalk at the driveways. This mud came from the excavation made on the premises of St. Elizabeth's Academy. The evidence further showed that no other excavations were going on in the vicinity of St. Elizabeth's Academy. One of the witnesses for the plaintiffs testified that the trucks carrying the mud from the excavation used the intersection of Pestalozzi Street and Louisiana Avenue.

Harder testified that his employees would clean the mud off the street (Louisiana Avenue) every evening after the last truck left. He said that he did not send any of his men down to the intersection of Pestalozzi Street and Louisiana Avenue to clean the intersection because there was no mud at that intersection. However, one of the witnesses for plaintiffs testified that he never saw anybody clean up the mud and that "it stayed there day and night for a long time."

Marie Boulch said Louisiana Avenue south of Pestalozzi Street "had quite a bit of mud on it" on February 1, 1957. She described the mud she saw as a brownish color, rather than black. In describing this condition of the street she said that the mud existed from the intersection of Louisiana Avenue and Pestalozzi Street to the first driveway south of Pestalozzi Street on Louisiana Avenue. She said there was mud on the crosswalk and on the sidewalk at the intersection. She testified that there was mud on the sidewalk west of Louisiana Avenue on the south side of Pestalozzi

Street and that this mud was the same color as that found on Louisiana Avenue. When asked what the condition of the particular piece of sidewalk was where she fell, which was on the south side of Pestalozzi Street west of Louisiana Avenue, she answered, "It had ice and snow and mud on it." She again described this mud as clay colored and brown, adding that it was the same color as the mud she saw on Louisiana Avenue at or near its intersection with Pestalozzi Street.

Marie Boulch further said that mud had been "tracked on the sidewalk" on top of the ice and snow. The sidewalk she had reference to was the south side of Pestalozzi Street, west of Louisiana Avenue. She added that in tracking or carrying the mud onto the sidewalk it mixed with the ice and snow. She explained that by the term "tracked on the sidewalk," she meant that the pedestrians would carry it on their shoes from the street onto the sidewalk. At another place in her testimony she said there was a lot of mud on the sidewalk.

Thomas Boulch testified that the sidewalk on the south side of Pestalozzi Street west of Louisiana Avenue on February 1, 1957, was "covered with mud, snow and ice * * * it was more of a slush." The mud that he saw was "clay colored." In describing the condition of the intersection of Pestalozzi Street and Louisiana Avenue on the aforesaid date, Thomas Boulch said it was "like a country road, covered with mud."

Prior to February 1, 1957, Marie Boulch saw mud on the sidewalk in the area where she later fell. On other occasions prior to February 1, 1957, and before the mud appeared in the area, she said she had walked along this sidewalk and found it in perfect condition. She was familiar with the area, having traveled it "quite a bit." Several days before she fell, a little snow had fallen which she said concealed the ice and the mud that had been tracked onto the sidewalk.

In the afternoon of February 1, 1957, Marie Boulch was taken to a grocery store in an automobile by her son. She described the condition of the streets and sidewalks as "very slippery." Because of this slippery condition of the streets and sidewalks she said she wore a pair of medium heeled oxfords and a pair of plastic galoshes. She did not recall whether the snow and ice was "solid" but said she thought it was "slushy." She described the weather as being very cold. She thought it was below freezing and for this reason she wore a long heavy winter coat. After she had completed her purchases at the store, which store seems to have been east of Louisiana Avenue she walked westwardly on the south side of Pestalozzi Street. She had a bag with a few groceries in it and in addition had her purse, which she thought was either on her arm or on her wrist. She had the bag of groceries under her arm.

When she reached Louisiana Avenue it "had quite a bit of mud on it." She crossed it and reached the sidewalk at the southwest corner of the intersection of Pestalozzi Street and Louisiana Avenue. In describing the condition of the sidewalk on that occasion, she said "it had ice and snow and mud on it." She described the mud as clay, "brown color" and said it was the same color as the mud she saw on Louisiana Avenue at or near its intersection with Pestalozzi Street. From there she proceeded westwardly on the south side of Pestalozzi Street and when she got to about the third concrete block of the sidewalk she fell and described her fall as follows: "I slipped and when I fell I slipped and went down, both feet out from under me * * *." When asked what she slipped on, she said, "I stepped up and I slipped on ice, the snow and the mud."

In another part of her testimony, in connection with her cross-examination, when asked if it was not ice on which she fell, she answered, "No it was not. It was ice, mud and snow." At this point in her testimony she again reiterated that Louisi-

ana Avenue was covered with mud. When asked what the quantity of the mud was with respect to the ice and snow, Marie Boulch answered, "Well, I will just say about 10 per cent. I wouldn't say half and half."

When further describing the condition of the sidewalk she said there were scattered pieces of bare concrete that had no ice or snow or mud. However, she could not say just where they were located but did say they were small and not big enough for a footing. After she fell she tried to get up but, as she put it, "flipped back down again." She said that after she fell down the second time she rolled over on to the grass between the sidewalk and the curb. She did not recall that there was any mud on top of the grass at this point. She thought that she remained in this position for five minutes or more. Thereafter, a man came up to her and assisted her to her home. The man who assisted her testified that when he first observed her "her lower half of her body was lying off in the street and her upper part was on the curb." He explained that the upper part of her body was on the grass between the sidewalk and curb. He described the condition of the sidewalk as "wet" and in another part of his testimony he said it was sloppy because "we had just got over a big snow." He noticed that Mrs. Boulch's clothes were dirty where she had been lying on the wet grass. On the day Marie Boulch fell, Thomas Boulch, her husband, noticed that the back of his wife's coat was covered with mud and that there was a burnt spot on it where she had "slid."

Marie Boulch was taken to the hospital the day of her fall and after her return from the hospital, approximately 17 days after she fell, she saw the mud on the back of her coat. When asked where the mud was on the coat, she said, "right back in the back where I slid." When asked if she could see where she was walking at the time she fell she answered, "I could see, yes, I was looking when I slipped." She further testified that because of the icy condition of the sidewalk she was picking her way as she walked.

Before discussing the point relied on by both defendants that plaintiffs have failed to make a submissible case against them and each of them, it is appropriate to take up for discussion at this time a point relied on by defendant Gutmann Company, wherein it contends that the trial court erred in denying its motion for a directed verdict filed at the close of the whole case because all of the evidence showed that said defendant was a general contractor and that all of the excavation on the job was done by Harder as an independent contractor. The Gutmann Company contends that the evidence failed to show that it exercised any control over Harder, his employees or the job other than that which is ordinarily exercised by a general contractor. In discussing this point, it will be assumed for the sake of the discussion, that defendant Harder can be found under the facts in this case to have been negligent.

The theory under which the plaintiffs sought recovery against defendant Gutmann Company, contained in their verdict directing instruction, was that the said defendant "controlled the details of the manner in which the work done by Richard E. Harder and his employees, was performed."

While the written contract between St. Elizabeth's Academy and the Gutmann Company was not in evidence, it seems undisputed that at the time Harder became the successful bidder to do the work of digging the excavation and the pile drilling he was at that time an independent subcontractor under the general contract held by the Gutmann Company. As between general contractor and independent contractor we said in the case of Southwestern Bell Telephone Co. v. Rawlings Manufacturing Co. et al., Mo.App., 359 S.W.2d 393, 1. c. 398: "It is an established rule that an employer of an independent con-

tractor is not liable for the torts of the contractor or his servants."

In the case of Williamson v. Southwestern Bell Telephone Co., Mo., 265 S.W.2d 354, l. c. 358, the court gave the general rule and definition of contractor as found in Restatement, Agency, Sec. 2(3) as follows: "'An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'" The court further said: "Under the rule, 'stipulations which entitle the employer to exercise a certain measure of control over the work, but go no further than to enable him to secure that it shall be properly performed, do not affect the quality of contracts which, apart from those stipulations, would be construed as independent.' Annotation 20 A.L.R. 684, 687." (265 S.W.2d l. c. 358.)

The case of Southwestern Bell Telephone Company v. Rawlings Manufacturing Co. et al., supra, was a suit by plaintiff to recover damages sustained when its underground cables were caused to fall into an excavation made by Richard Harder, who was the excavating contractor under contract with William Quigley, who was a general contractor employed by the Rawlings Manufacturing Company. The written agreement between the general contractor and the Rawlings Manufacturing Company was in evidence and said agreement detailed the duties of the general contractor. Among the duties detailed were: obtain all subcontractors bids; supervise all forms of construction and installations; stake out the job; see that all material delivered on sight is stored in the most convenient place and protected from the weather; give all lines, levels and grades to subcontractors; lay out subcontractor's work as building progresses; and see that all crafts carry out their portion of the work in the best workmanlike manner according to plans and specifications.

This court in discussing these details said:

"As for Quigley, his position was that of a general contractor charged with sufficient control over the work to see that it was done according to the plans furnished by the architects. He had no control over Harder's employees, their payment, or the method of excavating. The fact that Quigley exercised a certain measure of control does not remove Harder from his status as an independent contractor and make him Quigley's agent. Quigley cannot therefore be held, under the doctrine of *respondeat superior*, for Harder's acts or omissions." (359 S.W.2d l. c. 398.)

It is interesting to note that the subcontractor engaged to do the excavating was the same subcontractor that was engaged to do the excavating in connection with the St. Elizabeth's Academy construction.

As we will show later, there was little or no difference between the control retained and exercised by the Gutmann Company in the instant case and that retained and exercised by Quigley in the case of Southwestern Bell Telephone Company v. Rawlings Manufacturing Co. et al., supra.

A somewhat similar set of facts to those presented in the instant case is found in Salmon v. Kansas City, 241 Mo. 14, 145 S.W. 16, 18, 39 L.R.A.,N.S., 328. The Supreme Court referred to the Salmon case in the case of Williamson v. Southwestern Bell Telephone Co., supra, and said:

"* * * the contract provided, among other specific directions, that 'The first party shall commence work at such points as the engineer may direct, and shall conform to his directions as to the order of time in which the different parts of the work shall be done, as well as to all his other instructions as to the mode of doing the same.' It was held, considering the contract as a whole, that 'the powers given to the

city engineer are solely for the purpose of securing compliance with the specifications provided in the contract. By no fair construction can the provision authorizing him to direct the mode of doing the work be held to mean that it is his duty to step in between the contractor and his servant, and direct the latter in the details of his operations.'" (265 S.W.2d 1. c. 359.)

The evidence in the record before us is not sufficient to show that the Gutmann Company assumed or attempted to control the physical activities of Harder and his employees or the details of the manner in which the work was done by Harder and his employees. The control exercised by the Gutmann Company and its foreman was consistent with the original relationship of contractor and independent contractor and there was no measure of control exercised by Gutmann and Company or its employees that would serve to destroy this original relationship and create that of servant or employee.

█ The evidence in the record clearly shows that the Gutmann Company did not attempt to direct or control how Harder was to perform the excavation work. The evidence shows Harder was personally present every day that excavation work was done and at all times had a labor foreman on the job who would supervise the work of Harder's employees. It is true that the foreman of the Gutmann Company gave to Harder and his employees the lines and grades to be followed in the excavation work and how deep to excavate but this was doing no more than staking out the job as was done in the case of Southwestern Bell Telephone Company v. Rawlings Manufacturing Company et al., supra, and was doing no more than seeing that the excavation work was properly performed pursuant to the plans and specifications covering the construction job. As we said earlier, the details of how the excavation work was to be done was left to Harder's control and direction. We do not think

the direction by the foreman of the Gutmann Company to Harder to store some of the dirt and mud on the premises, to be used for "back fills," constituted an effort to control the details of how Harder was to perform the work of excavation. There is nothing in the evidence to show that the Gutmann Company attempted to control or direct Harder as to the amount of dirt and mud to be placed on each truck or what route the trucks were to follow after the trucks were loaded with the dirt and mud. There is nothing in the record to show that the Gutmann Company exercised any type of control over the trucks when they were leaving or after they left the premises of the St. Elizabeth's Academy. The admission by Harder that the foreman of the Gutmann Company was present at all times to check whether the work done by him complied with the specifications on the job was no more than that of the ordinary general contractor in seeing that the subcontractor performed his work in the best workmanlike manner according to the plans and specifications. (See the detailed duties of the general contractor under the written agreement in the case of Southwestern Bell Telephone Company v. Rawlings Manufacturing Co., et al., supra.)

The record is completely devoid of any evidence wherein the Gutmann Company or its employees attempted to tell Harder's truck drivers where to go or what to do. Harder testified that the man who operated the trucks were his employees and were paid by him and the record shows no attempt on the part of Gutmann Company or its employees to control the activities or operations of these truck drivers.

█ Not only does the record fail to show an attempt upon the part of Gutmann Company or its employees to control the activities or manner of operation of Harder and his truck drivers, but it also fails to show any evidence that the right of control by Gutmann over Harder and his employees ever existed except such as was consistent with the original relationship of

contractor and independent contractor. Because of this lack of evidence, we feel that the plaintiffs failed to show that the Gutmann Company "controlled the details of the manner in which the work was done by Richard E. Harder and his employees," as they had to do in order to justify the giving of their instruction against the defendant, Gutmann Company.

Plaintiffs contend the evidence shows that the act complained of involved an inherent risk of injuries to plaintiff, Marie Boulch. They claim that where an intrinsically dangerous risk is created by the duties of the independent contractor, imposed by the general contractor, it constitutes an exception to the rule that an employer of an independent contractor is not liable for the torts of the contractor. In support of their contention plaintiffs cite the case of Southwestern Bell Telephone Company v. Rawlings Manufacturing Company et al., supra, wherein the court said:

> "There is an exception to this where the work, during its progress, creates a peculiar risk of bodily harm to others unless special precautions are taken. If the risk is such that it should be recognized by the employer and personal injury results to a third party by reason of the contractor's failure to take necessary precautions, then the non-delegable duty is imposed and the employer held liable. Stubblefield v. Federal Reserve Bank of St. Louis, 356 Mo. 1018, 204 S.W.2d 718." (359 S.W.2d 1. c. 398.)

In the case of Stubblefield v. Federal Reserve Bank of St. Louis, supra, we quoted from 2 Restatement, Torts, Secs. 413, 416, as follows:

> " 'One who employs an independent contractor to do work, which the employer should recognize as necessarily requiring the creation during its progress of a condition involving a peculiar risk of bodily harm to others unless special precautions are taken, is subject to liability for bodily harm caused

to them by the failure of the contractor to exercise reasonable care to take such precautions.' " (204 S.W.2d 1. c. 722.)

In the Stubblefield case plaintiff was struck on the head and shoulders by a wooden wedge which fell from near the top of a building. The Federal Reserve Bank was the owner of the building, Fruin-Colnon Contracting Company was the general contractor, and St. Louis Contracting Company and Swift Roofing Company were subcontractors. The contract of the St. Louis Contracting Company called for certain stone work. The wooden wedge fell while the St. Louis Contracting Company was in the process of resetting cornice stones and the evidence showed that there was no covering, guard, barrier or any protection for the public on the sidewalk on the side of the building where the work was being performed. The evidence also showed that the wooden wedge would fall when the stones were moved unless the workmen held onto it. As shown, the sidewalk was unprotected. There was a verdict for the defendants and the trial court granted a new trial to the plaintiff as to the Federal Reserve Bank of St. Louis, the owner, and the Fruin-Colnon Contracting Company, general contractor. The court said (204 S.W.2d 1. c. 722): "The mere recital of the nature of the work and the surroundings demonstrates its inherent danger and there was a primary, nondelegable duty upon the owner and the general contractor to take measures commensurate with the danger."

We find no such inherent danger connected with the work of Harder involving a peculiar risk of bodily harm to others in the performance of the work undertaken by Harder. There must be, as indicated in the Stubblefield case, a special or peculiar danger connected with the work of the independent contractor. The work of Harder in the performance of the excavation and the hauling of the dirt was not in and of itself attended with danger to others. It cannot be said that the hauling of exca-

vated materials is so intrinsically or necessarily dangerous to third persons as to bring the general contractor within the exception to the general rule. The exception seems to encompass only those cases where no matter how carefully the subcontractor may perform the work, danger arises from the very performance of the work itself and not from the manner in which it is done. The hauling of dirt in trucks, if done carefully and without negligence on the part of the hauler, is not work which in itself is inherently dangerous. If the contractor directs the subcontractor to perform an act which is intrinsically dangerous to others the general contractor cannot escape liability for injuries that may occur. In such cases the injury flows from the doing of the act as its natural consequence, and not from the manner in which the act is done. Salmon v. Kansas City, 241 Mo. 14, 145 S.W. 16.

Assuming Harder to be negligent, Marie Boulch's injury is the result entirely of the wrongful act of Harder and his employees in permitting the mud to drop from the truck and in failing to clean the street when the mud does so fall. There is no doubt that the work under the subcontract undertaken by Harder could have been done without injury to anyone and the injury to plaintiff, Marie Boulch, could only be the result of the negligence, if any, on the part of Harder and his employees. We rule there was no nondelegable duty in connection with the independent contract of Harder.

We consider now the point urged by Harder that the trial court erred in overruling his motions for directed verdict at the close of plaintiffs' case and again at the close of all of the evidence on the ground that plaintiffs failed to make a submissible case for the jury.

■ His first contention in this connection is that, while plaintiffs' evidence showed that some mud or dirt may have been deposited from the wheels of the trucks owned and operated by Harder, there was no direct evidence to show or indicate that such mud deposited by Harder's trucks ever got on the sidewalk at the time and place of Marie Boulch's fall. This contention of said defendant is not sustained by the record.

The evidence clearly shows that mud, described by various witnesses as "clay colored" brown clay, was seen falling from the trucks of Harder as they traveled over Louisiana Avenue. These same witnesses testified to seeing this same kind of mud at the intersection of Louisiana Avenue and Pestalozzi Street. Harder admitted that mud would drop from the trucks as they traveled along the street. The evidence shows that the mud came from the excavation made on the premises at St. Elizabeth's Academy. The evidence further shows that no other excavations were being made in the vicinity of the Academy at that time.

The evidence further showed that some of this mud landed on the sidewalk at the driveways. One of the witnesses for plaintiffs testified that the trucks carrying the mud from the excavation used the intersection of Pestalozzi Street and Louisiana Avenue. Marie Boulch testified that there was mud on the crosswalk and on the sidewalk at the intersection of Pestalozzi Street and Louisiana Avenue. She further testified that there was mud on the sidewalk west of Louisiana Avenue on the south side of Pestalozzi Street and that this mud was the same color as that found on Louisiana Avenue and the same color as that which had fallen off of Harder's trucks. She described the mud as "clay colored" and brown. She further testified that the mud had been "tracked on the sidewalk" on top of the ice and snow. The sidewalk she had reference to was the south side of Pestalozzi Street west of Louisiana Avenue in the area in which she had fallen. She stated that in tracking the mud onto the sidewalk it mixed with the ice and snow. As the evidence shows, she stated that the pedestrians would carry the mud on their shoes from the street onto the sidewalk.

Thomas Boulch testified that the mud was in this same area of the sidewalk and that it was "clay colored." He stated that the intersection of Pestalozzi Street and Louisiana Avenue was "like a country road covered with mud." Again, when Marie Boulch was describing her fall, she stated that the sidewalk on that occasion "had ice, snow and mud on it." She said the mud was clay, "brown color," and that it was the same color as the mud she saw on Louisiana Avenue at or near its intersection with Pestalozzi Street.

We think the aforesaid testimony appearing in the record is sufficient evidence from which the jury could find that mud and dirt deposited from the trucks of the defendant on the street got on the sidewalk in the area in which plaintiff fell and this contention of plaintiff must fail.

In the next contention asserted by Harder in support of his point he asserts there was no direct evidence to show that it was actually mud rather than ice and snow that caused the plaintiff to fall.

In reviewing this and other contentions made by Harder, we must consider the evidence in the light most favorable to plaintiffs, giving to them the benefit of all legitimate inferences to be drawn from the evidence, Osterhaus v. Gladstone Hotel Corp., Mo., 344 S.W.2d 91; Gregory v. Robinson, Mo., 338 S.W.2d 88, and that the case may not be withdrawn from the jury unless there is no room for reasonable minds to differ on the issues, in the exercise of a fair and impartial judgment, Gregory v. Robinson, supra.

Harder contends that in the instant case Marie Boulch does not say whether she slipped on the ice or on the snow or on mud or all three of them. He says she does not attempt to charge that the mud caused her fall, either alone or in combination with the other two, and contends that plaintiffs leave this element of proof to conjecture.

Again, said defendant states that the efficient cause, that is, the one that set the fall in motion and brought about Marie Boulch's injury, has not been definitely fixed as a slip on snow and ice or a slip on snow and ice mixed with mud. He further contends that it has not been established that she would not have fallen if the mud was not on the street. He concludes his various contentions by stating that the plaintiffs did not meet their burden of showing that there was a direct connection between the negligence charged and the injuries sustained by Marie Boulch. In this connection Harder cites Rogers v. Thompson, Mo., 284 S.W.2d 467; Osterhaus v. Gladstone Hotel Corp., supra; Lindsay v. Wille, Mo., 348 S.W.2d 1.

The general rule of law relied on by Harder that there must be evidence of negligence and that there must be a causal connection between the negligence and the injury cannot be disputed. Likewise, the further rule of law urged by Harder that a verdict may not depend upon guess work, conjecture and speculation is not subject to controversy.

First of all, we do not agree with Harder that Marie Boulch did not say what the substance on the pavement was at the time she slipped. Adverting to her testimony, when she was asked what the condition of the particular piece of sidewalk was where she fell, she answered, "It had ice and snow and mud on it." She had previously testified that there was mud on the sidewalk in the area in which she fell and that it was clay colored and brown and the same color as the mud she saw on Louisiana Avenue at or near its intersection with Pestalozzi Street. When asked what she slipped on, she said "I slipped on ice and snow and mud." In her cross-examination when she was asked if it was not ice on which she fell, she answered, "No, it was not. It was ice, mud and snow." She estimated the quantity of mud mixed with the ice and snow was between 10% and 50%.

The above testimony given by Marie Boulch constitutes direct evidence of the

fact that there was mud on the sidewalk and that she fell on a mixture of ice, snow and mud. There was additional evidence given by both plaintiffs which showed that after the fall there was mud on the back of the coat of Marie Boulch. We feel that the jury could have properly inferred that this mud came from the sidewalk where plaintiff fell.

■ We have not been referred to a case by the parties dealing with a factual situation approximating the one before us. There is a myriad of cases dealing with injuries resulting from the accumulation of ice and snow. We need not concern ourselves with these cases other than to point out that Harder had no duty to remove the ice and snow from the sidewalk and he had no liability for injuries resulting from the natural accumulation of ice and snow, Luettecke v. City of St. Louis, 346 Mo. 168, 140 S.W.2d 45, and Paul v. Terminal Railroad Ass'n of St. Louis, Mo.App., 296 S.W. 2d 167. However, he had the duty to see that risks of bodily harm incident to a slippery condition of the sidewalk produced by natural causes was not increased beyond that naturally created by the elements, Paul v. Terminal Railroad Ass'n of St. Louis, supra; Martin v. Gilmore, Mo.App., 358 S.W.2d 462.

It was said in Beineke v. Terminal Railroad Ass'n of St. Louis, Mo., 340 S.W.2d 683, l. c. 688, "It is the law that where the negligence of a defendant combines with natural causes to produce an injury, liability follows."

While the cases referred to above primarily involve the liability of the owners of property or the owners of property abutting a sidewalk on which a dangerous condition was created by the property owners, nevertheless, we feel the same principle of law is applicable where one who is not an owner or an abutting owner of the property involved creates a situation whereby a dangerous and hazardous condition caused by snow and ice is increased beyond that naturally created by the elements.

■ In the instant case Harder in the course of performing his work used the streets. In making use of the streets he had the duty of exercising reasonable care and diligence and this duty imposed the obligation not to create an unsafe condition whereby pedestrians would carry the mud dropped from his trucks onto the sidewalk where it might increase a hazardous condition beyond that naturally created by the elements.

In the case of Hines v. Western Union Telegraph Company, 358 Mo. 782, 217 S.W. 2d 482, plaintiff charged the defendant Telegraph Company, a permissive user of the street for a purpose other than travel, with negligence in permitting water and ice to accumulate upon the place where plaintiff fell; in permitting water to accumulate in a manhole and run off on a crosswalk when such defendant knew, or should have known the water would freeze and become slippery and dangerous and in failing to warn of the resultant dangerous condition or to remove the ice and water and restore the area to a reasonably safe condition. The trial court had sustained a motion of said defendant for a directed verdict. The Supreme Court in holding that the trial court erred in sustaining the defendant's motion for a directed verdict said: (l. c. 486)

"In our opinion, it could have been reasonably found that defendant Telegraph Company in permitting discharge of the water from its installations in the circumstances, during such weather conditions, and upon such a busy street, and in failing to warn of the consequent icy condition or to cause the removal of the water and ice was negligent. It seems to us that a jury could reasonably have decided that the water had so flowed out of the manhole for such a period of time that defendant Telegraph Company should have known of the watery, icy condition. We bear in mind the negligence charged is not the discharge of the water, which discharge, in itself, might not be consider-

ed negligent; but the jury could have reasonably found it was negligent to permit the discharge at a time of freezing weather and to fail to remove the accumulated ice. It could be reasonably said, it should have been foreseen, in the circumstances, that the discharged water would freeze and render the area unsafe for traveling.

\*    \*    \*    \*    \*    \*

" \* \* \* As we have said, we believe plaintiff made out a submissible case against defendant Telegraph Company, but the questions whether the Telegraph Company was negligent in the circumstances and whether such negligence was a proximate cause of plaintiff's injury *were for the jury.*" (217 S.W. 2d l. c. 486)

In the case of Oettel v. J. A. Schaefer Const. Co., Mo.App., 51 S.W.2d 870, defendant was engaged in excavation work. In the course of its work defendant connected a hose to a fire plug in order to obtain water required on the job. Water had been allowed to escape from the fire plug and then to flow down the street against the curb to the nearest sewer inlet which was located some distance beyond the place of injury to plaintiff. Close to the excavation job and between the job and the sewer inlet was a parking lot, used for storing automobiles, with a concrete driveway leading up into the lot from the street. Automobiles passed in and out of the parking lot and in passing through the stream of water flowing from the fire plug they splashed water out into the street. The weather was cold on the day of plaintiff's injury and the temperature was below freezing and as a consequence ice formed over an area covered or affected by the water. As plaintiff was in the act of alighting from a streetcar she slipped upon the ice and fell and sustained injuries. From a judgment in favor of plaintiff defendant appealed and this court in affirming the judgment said:

"We cannot avoid the conclusion, therefore, that the act of defendant in permitting the water to escape and flood the street at a time when the temperature was below freezing was the proximate cause of plaintiff's injury, unbroken by any efficient, intervening cause, for which defendant should be held liable to respond." (51 S.W.2d l. c. 872)

From the holding in these cited cases it is plainly seen that where defendant makes use of the streets he has the duty not to permit the use to create conditions unsafe for pedestrians using the street.

Applying the aforesaid to the particular facts in this case Harder had the duty to keep the streets clear of mud from his trucks and he had the further duty to foresee and take precautions against the tracking of mud from the street onto the sidewalk, whereby it might increase the hazard and danger beyond that naturally created by the snow and ice.

We feel that the jury could have found that the dropping of the mud on the street and the failure of Harder to clean the street in question was negligence and that Harder could have reasonably foreseen that the mud would be tracked and carried by pedestrians onto the sidewalk. We have demonstrated that plaintiffs' evidence shows that Marie Boulch slipped and fell on a mixture of snow, ice and mud and that it was the same kind of mud that fell off Harder's trucks. The difficult question, not easily solved, is: "Does the adding of mud to a slippery substance, namely, ice and snow increase the danger and hazard beyond that naturally created by the ice and snow?"

We think the liability of Harder under the circumstances appears to be reasonably close. However, we cannot say as a matter of law that the addition of mud to the ice and snow did not increase the danger and hazard beyond that naturally created by just the ice and snow. There isn't any doubt but what reasonable minds

may differ on this issue and for that reason it is one for the jury. Gregory v. Robinson, Mo., 338 S.W.2d 88; Cuddy v. Shell Petroleum Corporation, Mo.App., 127 S.W.2d 24.

■ The next point relied on by Harder is that Marie Boulch was guilty of contributory negligence as a matter of law. He contends that she exposed herself voluntarily to the known danger of the slippery sidewalk and its condition and that she knew for some time prior to the accident that the sidewalk was covered with ice and snow and in a slippery condition. However, Harder fails to give consideration to a further fact shown by the evidence and that is the record shows a light snow had fallen prior to the time of Marie Boulch's fall and had concealed the mud that had been carried onto the sidewalk.

In the case of Newberry v. City of St. Louis, 335 Mo. 1, 70 S.W.2d 546, plaintiff knew of the existence of a strip of ice extending across the sidewalk and had safely passed over the icy strip on the sidewalk for four days next preceding the day she fell and was injured. The evidence showed that the strip of ice was covered with a thin layer of snow. The court said:

"* * * Her knowledge of the ice at that point was a fact bearing upon the issue of whether she was negligent in the manner in which she proceeded upon and attempted to pass over the sidewalk. (Cases cited.) While, in view of her knowledge of the condition there existing, she was bound to exercise reasonable and ordinary care under the circumstances, yet she was not required, on approaching this point in the sidewalk, to desist from the use of, and leave or abandon, the sidewalk and go onto the street unless the existing condition was so obviously and glaringly dangerous that an ordinarily prudent person would not attempt to pass over the sidewalk, which was a question for the jury." (70 S.W.2d, l. c. 548)

Again, in Martin v. Gilmore, Mo.App., 358 S.W.2d 462, 1. c. 466, the court said:

"It is thoroughly settled law in this state that a pedestrian, knowing of a defect in a street not obviously dangerous, may use it, provided he exercises the care which a reasonably prudent person would exercise under the circumstances. * * *"

The evidence in the instant case discloses no obviously and glaringly dangerous condition. We are unable to hold that Marie Boulch was guilty of contributory negligence as a matter of law and we rule that the question of her contributory negligence was one for the jury to decide.

■ In his next point Harder states that plaintiffs in paragraph 7 of their petition plead "common law negligence" and in paragraph 8 plead specific negligence, wherein they allege the violation of a City Ordinance. Plaintiffs were not permitted to introduce the City Ordinance and, thereafter, abandoned this allegation of their petition. Harder then states, "that where *general* negligence is pleaded, followed by specific negligence pleaded, the plaintiff cannot recover unless she recovers on the specific negligence which she abandoned. In a word, the plaintiffs abandoned the case which they relied upon in their pleadings."

We share the feeling of plaintiffs' counsel when he said "I'm at a loss to understand appellants' Point VII." Harder and his counsel use the terms "common law negligence" and "general negligence" synonymously. As applied to the petition in the instant case the terms cannot be used similarly. It is a sufficient answer to Harder's contention to point out that the "common law negligence" pleaded constituted allegations of specific negligence and that the negligence submitted in plaintiffs' instruction for the jury's finding was the specific negligence as pleaded.

In his final point Harder contends the trial court erred in refusing to admit in

evidence a purported written, unsigned statement containing answers by Marie Boulch to questions propounded to her by an attorney and recorded by a stenotype reporter. The questions were asked and the alleged answers were given to the attorney and the stenotype reporter shortly after Marie Boulch's accident and while she was a patient in the hospital.

Harder offered in evidence an exhibit which was a thermofax copy of a purported question and answer statement taken of plaintiff, Marie Boulch. In support of his effort to have this exhibit admitted he offered as a witness the stenotype reporter who was present at the time the statement was taken. We think a fair analysis of this witness' testimony shows that he had a vague recollection of being present in the hospital on February 16, 1957, when plaintiff, Marie Boulch, was questioned by an attorney, named Springfield Baldwin. He recalled transcribing the notes he had taken and prepared an original and two typewritten statements which he turned over to the attorney. He did not keep a copy for his own files. He stated that he did not have a copy of the original notes, that they were destroyed at a time when the basement in which they were stored was flooded. When he was shown the sheaf of papers, which proved to be a thermofax copy of questions and answers, he stated that he had first seen this thermofax copy just five minutes before he was called upon to testify. When he examined the thermofax copy he said that he recognized the style, as he explained it, " * * * of setting up the statement," as his. But on cross-examination he stated that he only had " * * * a vague recollection of doing the work." On direct examination he said the statement was written up as made, but on cross-examination he again said that he only remembered going to the hospital with the attorney and taking the statement and that the contents of the statement did look familiar, but that he would not know the circumstances of the case or the cause of Marie Boulch's injury. He had no recollection of the questions asked and the answers given. Marie Boulch did not sign the statement and the witness stated that she was not asked to sign the statement. This was the extent of the evidence offered to support the introduction of this exhibit. There was no effort made to gain from this witness or from any other witness the whereabouts of the typewritten original or copies made by the reporter from his notes and there was no evidence offered to show the circumstances under which the thermofax copy was made. There was no evidence to show that the thermofax copy was a true and exact copy of the typewritten original or copies that had previously been prepared and, as is readily noted, the witness failed to identify the thermofax copy, if admissible, as an accurate and correct statement of the questions asked and the answers given at the time of his appearance in the hospital

Counsel for Harder in his brief states that this exhibit was offered in evidence for the purpose of impeaching the plaintiff's testimony. He fails to tell us on what rule of law he relies for the introduction of a written, unsigned statement. The sole argument put forth by Harder in his brief concerning this point is that the thermofax copy of the statement given to the attorney and the stenotype reporter should have been allowed in evidence having explained that the original notes taken by the reporter were lost. In support of his point Harder has cited cases where the court held, that where the original of a contract or written instrument was lost, destroyed or for some other reason could not be found, secondary evidence of the contents of the instrument is proper, if a proper predicate has been laid for its introduction. However, before a party may introduce secondary evidence of the contents of a written instrument, it must be shown that the original, if obtainable, would be admissible. We need not concern ourselves with the question of whether the thermofax copy in question in the instant case was proper secondary evidence of the

written statement prepared by the stenotype operator.

 We have not been told by Harder under what theory of law or rule of evidence the transcribed statement of the stenotype operator would be admissible in evidence. We recognize that any statement, oral or written, made by plaintiff conflicting with material testimony given by her at the trial, is admissible. Nelson v. Tayon, Mo., 265 S.W.2d 409, 1. c. 415. It has been ruled many times that in the case of official stenographers if they can identify their transcripts and swear to the accuracy of them that these transcripts may be admitted in evidence. Vessels v. Kansas City Light & Power Co., Mo., 219 S.W. 80; Miller v. Geeser, 193 Mo.App. 1, 180 S.W. 3. In the case of Woerheide v. Kelley, Mo., 243 S.W. 158, the court said at page 161:

> " * * * But it appears that even in the case of other stenographers, or parties making contemporaneous writings, where they swear to the accuracy of their notes and the accuracy of the transcript thereof, such transcript may be introduced, where and although the witness cannot recall all of the statements made. * * *"

To the same effect see Hudlow v. Langerhans, 230 Mo.App. 1160, 91 S.W.2d 629. In this case and in all other cases wherein the transcript of reporters, whether official stenographers or not, are admitted in evidence it is only after the witness has testified positively to the accuracy of his notes and the accuracy of the transcript made from the notes. This quality of testimony is absent in the instant case. The best that can be said for this witness' testimony is that he vaguely remembers taking the questions and answers of the plaintiff and that the copy shown him does look familiar because he recognized it as his style of setting up a statement, but he had no recollection of the circumstances of the case or the cause of plaintiff's injury. Assuming, without ruling, that a proper copy of the transcribed notes would be admissible in evidence, the exhibit offered by Harder was inadmissible because, the witness failed to testify positively to the accuracy of his notes and to the accuracy of his transcription of the notes. We rule that the trial court did not err and did not abuse its discretion in refusing to admit in evidence the exhibit that forms the basis of Harder's complaint in this point.

The judgment in favor of plaintiffs and against defendant John B. Gutmann Construction Company, Inc., is reversed and said judgment in all other respects is affirmed.

JACK P. PRITCHARD and J. MORGAN DONELSON, Special Judges, concur.